Frank FORD, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–725.

Court of Criminal Appeals of Oklahoma.

Feb. 14, 1975.

Charley Ellis Cabaniss, Clinton, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM:

Appellant, Frank Ford, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Custer County, Case No. CRF-72-133, for the offense of Robbery With Firearms, in violation of 21 O.S.1971, § 801. His punishment was fixed by jury at a term of twelve (12) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness at trial was Clara Gainer. She testified that she was employed at the Trade Winds Motel in Clinton, Oklahoma, during the hours of

11:00 p. m. until 7:00 a. m. in the morning and was so employed on the night of November 26, 1972. After having been shown what had been marked for identification as State's Exhibit No. 1, she identified the item as a registration card for the motel. She further stated that she had previously seen this particular card before on November 26, when a man by the name of Frank Ford registered at the motel. She then pointed out Frank Ford, the defendant, in the court room as the man who registered at the motel that night. She further stated that she knew it was the 26th of November, 1972 because the date was stamped on the back of the registration card.

Odessa Dagle testified that she was employed at the Trade Winds Motel in Clinton, Oklahoma, as desk clerk during the hours from 3:00 p. m. until 11:00 p. m., and was so employed on December 1, 1972. She further testified that one of her duties as desk clerk was to watch over the register and keep tabulations on it, and that on the night of December 1, 1972, she ran a tape on the cash register which totaled $649.84. After having been shown State's Exhibit No. 2-A, a cash register tape, she testified that it was the same tape she ran on December 1, 1972, because she had signed her name on it. After having been shown State's Exhibit No. 2-B, a food charge voucher, she testified that said voucher was paid out by her to the restaurant on December 1 and that she knew this because she had her signature on it. After having been shown State's Exhibit No. 2-C, a payout laundry voucher, she testified that said voucher was paid out by her to a deliveryman for the laundry on December 1, and that she knew this because her signature was also on it. She was then shown State's Exhibit No. 2-D, a check for $40.00, and she testified that she had seen this check previously when at the motel she cashed the check for a man. She was then shown State's Exhibit No. 2-E, an advance salary voucher, whereafter she said that she had previously seen said voucher the night of December 1, when

she checked the register. She lastly testified that on the evening of December 1, 1972, when she left work, Ray Stine took over as clerk, and at such time all of the contents including State's Exhibits A, B, C, D and E of State's Exhibit No. 2 were in the cash register.

Chester Ray Stine testified that during the years 1955 to 1961 he was employed by the Clinton, Oklahoma Police Department, but that presently he was employed as night clerk at the Trade Winds Motel in Clinton, Oklahoma three nights a week from 11:00 p. m. until 7:00 a. m. He further testified that on the night of December 1, he arrived at work at about 11:00 p. m. He said that later that night he observed through the window at about 11:20 p. m., two colored males walking along the south side exterior of the building and that thereafter the two males entered the motel office through the door and jumped over the counter. He said that the intruders held him at gunpoint and asked him to open the cash register which he did. The witness was then asked whether or not the two males who robbed him on that night were presently in the court room. An evidentiary hearing was then had outside the presence of the jury to determine whether or not the witness' identification of the robbers would be admissible. From this hearing the following facts were adduced: Mr. Stine first saw the parties who came into the motel that night as they walked outside the window; he saw their faces after they came in the door and jumped over the counter, but when the parties were over the counter they remained behind him; he next saw the robbers at the police station after having been requested to view suspects. While he was at the station the police brought out defendant Ford and he recognized defendant Ford as the man who had robbed him at the motel that night. Thereafter, out of the presence of defendant Ford he subsequently identified defendant Jackson as the other party involved in the robbery. On further cross-examination he said that his testimony was that he saw enough of those two men at the motel to make a positive identification of them in court. The court then ruled that the in court identification would not be based on the view in the lineup or in custody viewing and therefore overruled defendant's objections.

He then testified that the two men who robbed him that night were present in the court room and that said individuals were defendant Ford and defendant Jackson. He was then shown State's Exhibit No. 2 and he thereafter testified that said items resembled or looked similar to what was in the cash register that night. He further testified that following the robbery he looked in the cash register and found it empty. He stated that as he went to the telephone to call the police, he noticed the stamp machine was gone. He was then shown State's Exhibit No. 3, a stamp machine, and he testified that said machine resembled the stamp dispenser taken that night. He lastly testified that following the robbery he called the Clinton Police Department whereafter he was later met by Officer McClendon, to whom he related the details of the robbery.

Mark McClendon testified that he was employed as a Patrolman for the Clinton Police Department and was so employed on December 1, 1972, during the hours of 8:00 p. m. until 6:00 a. m. He further testified that on the night of December 1, he answered a dispatch concerning the Trade Winds Motel and that upon arrival at the motel he met with the motel attendant, Mr. Stine, who informed him that he had been robbed. Mr. Stine furnished him with a description of the robbers and further, Mr. Stine told him that the robbery was accomplished by the use of a gun. He further testified that earlier that evening he had issued a traffic citation to a Mr. Ford who fit the description of the robber given him by Mr. Stine. He then issued an order for an all points bulletin for Mr. Ford. He testified that he later received a radioed dispatch from Trooper Jones and Trooper Van Arsdell at approximately 11:50 p. m. and that thereafter he arrived at East 4th Street and Frisco Avenue in Clinton where

he observed the highway patrol unit and the vehicle driven earlier by Mr. Ford as they were rolling to a stop. He stated that at that time he and Trooper Jones approached the passenger's side of the vehicle, which was driven by Mr. Ford, and that he saw a man bent over with his hands on the floorboard at which time Trooper Jones drew his pistol, asked the man to bring his hands up in plain view and to get out of the car, which he did. He testified that at that time he seized three $10.00 bills which were crumpled on the floorboard. He further stated that the front pants' pockets of defendant Jackson were crammed completely full of money and that the money was seized at that time by Trooper Jones, Trooper Van Arsdell and Captain Jay Green of the Clinton Police Department. He then identified this man as defendant Jackson and pointed him out in court. He testified that the money seized was put into a manila envelope. He was then shown State's Exhibits 2–A through 2–E and he testified that they originally came out of the pocket of defendant Jackson. He was then shown what was marked State's Exhibit No. 4, which was a total of the amounts of all the cash, coins, paid out vouchers and checks. He testified that early in the morning of December 2, 1972, he drew this total which equaled $642.57. He then identified the postage stamp dispenser which had been marked as State's Exhibit No. 3 as the dispenser which had been brought to the Clinton Police Department and given to him by Captain Jay Green. He then identified State's Exhibit No. 5 which was a latent fingerprint card showing the latent fingerprints he had taken from the machine on the night of December 2, 1972.

Jay Green testified that he was employed as a Captain on the Clinton Police Department and was so employed on December 1, 1972. He stated that on that night he was involved with Mr. McClendon in an investigation concerning the Trade Winds Motel and that he was present at the arrest of the defendants, Ford and Jackson. He stated that subsequent to the arrest all items seized were placed in an envelope and turned over to Trooper Van Arsdell. He testified that he took defendant Jackson to the station and that thereafter he went to the Trade Winds Motel, searched the area and subsequently found a stamp dispenser (State's Exhibit No. 3).

Tom Siler testified that he was employed as a Lieutenant on the Clinton Police Department and was so employed on December 6, 1972. He then identified State's Exhibit No. 5, the latent prints lifted from a stamp dispenser machine and given to him. He stated he checked the prints with the suspects and thereafter forwarded them to the Oklahoma State Crime Bureau for their comparison.

Raymond Homer testified that he was employed by the State of Oklahoma Bureau of Investigation as an identification officer and that he received through the mail, on December 12, 1972, State's Exhibit No. 5, a latent fingerprint card. He was then given State's Exhibit No. 7, identifying it as a fingerprint card taken by the Custer County Sheriff's Office on December 1, 1972 with the name on the card being Thomas Field Jackson. He was then shown State's Exhibit No. 6, identifying it as a fingerprint card submitted by the Clinton Police Department which had been taken on December 1, 1972 also bearing the name of Thomas Field Jackson. He then testified that in his opinion State's Exhibits Nos. 6 and 7 were identical. He lastly testified that after an examination of latent prints taken from the stamp dispenser and State's Exhibit No. 7 fingerprint card, in his opinion, the latent print lifted by the Clinton Police Department on December 2, 1972, was identical to the number five finger bearing the name of Thomas Field Jackson.

Don Jones testified that he was a Trooper with the Oklahoma Highway Patrol and was so employed on December 1, 1972, during the hours of 6:00 p. m. until 2:00 a. m. He testified that while he and his partner, Sam Van Arsdell, were at the Standard Station five miles east of Clin-

ton, Oklahoma, an all points bulletin was received which gave a description of the possible armed robbery suspects and a description of the car. Thereafter he saw a car at the service station which fit the description and pursuant to the police dispatch they followed the car westward into Clinton, approximately five miles. Upon their arrival in the city limits they signaled the car to stop by shining their red light on the car. He further testified that the car stopped and that Van Arsdell and Ford got out meeting between the two cars. He stated that at that time he walked up to the passenger side of the automobile, looked in and noticed the passenger had money in his hands and was stuffing it into his pockets. He then identified the passenger as Thomas Field Jackson, the defendant present in court. He testified that he and other law enforcement officials, Van Arsdell, Jay Green and Mark McClendon then searched defendant Jackson and found a quantity of cash and checks on his person, said items then being placed in a manila envelope.

Sam Van Arsdell testified that he was employed as a Trooper for the Oklahoma State Highway Patrol on December 1, 1972, during the hours of 2:00 p. m. until 2:00 a. m. He then testified to essentially the same facts as did his partner, Trooper Don Jones.

The State then rested.

The defendant then took the stand to testify in his own behalf. He testified that he lived in Oakland, California, and that he had been in Clinton, Oklahoma to visit his mother for Thanksgiving. He testified to the following facts surrounding the day of December 1, 1972. He stayed around his mother's house most of the day until about 4:00 p. m. when he went to see a sister who was in the hospital. Thereafter, he went to see his grandmother, Pearlie Jones and he arrived back at his mother's house about 5:30 or 6:00 p. m. His mother's house is in the east part of Clinton about two and one half blocks from "The Bottom." The next time he left his moth-

er's house was about 10:45 that evening when he went to "The Bottom" to get some cigarettes. Upon his arrival, at Lois Murphy's place, he met Mr. Jackson who asked him to take him to get some cards. At about 11:00 p. m. while they were driving around, an officer stopped their car. After having been stopped for the traffic citation, they proceeded to the Fourth Street Grocery where he bought some cigarettes and a deck of cards. He then went back to "The Bottom" and let Jackson out on Court Street. This was approximately 11:15 p. m. and thereafter he went home to look for his driver's license which had been the matter of the traffic citation. After finding his driver's license, he and his girlfriend went to the police station and while his girlfriend waited in the car he took his driver's license into the station to show to a dispatcher. After arriving back at his mother's house he stayed there a few minutes and then left alone to go to "The Bottom." On his way to "The Bottom" he passed Effie's place where Jackson ran out and stopped him. This was at approximately 11:35 p. m. Jackson told him about a party in Weatherford and they left together to go to the Cherokee Station to buy some gas and to check his tires. After deciding that his tires were bad, he decided to go home and get his mother's car. He was stopped by the Highway Patrol before he got to his mother's home. While he was talking to the officer he noticed three or four other officers searching Jackson and taking something out of his pockets. However, he could not see what it was. Later, he was taken to the station where he was brought before Mr. Stine and thereafter jailed. He testified that on the night of the alleged incident he did not go to the Trade Winds Motel but for the most part had remained down at "The Bottom."

Yvette Ray testified that she lived in Oakland, California, was the girlfriend of Frank Ford and was presently staying with Mr. Ford's mother in Clinton, Oklahoma. She testified to essentially the same facts as did defendant concerning the latter part

of the evening of December 1, 1972, when she and the defendant were together.

Thomas Field Jackson, co-defendant, testified that he was not involved in the robbery on December 1, 1972, but rather had been involved in card games, such games being the source of his money. He testified to essentially the same facts concerning the evening of December 1, 1972, when he and the defendant were together.

The defendant Thomas Field Jackson and defendant Frank Ford then rested.

Albert Gorshing was called in rebuttal on behalf of the State. He testified that he was employed by the State of Oklahoma as an investigator for the District Attorney's office and had been for a little over four years. He further stated that he had occasion to speak with Yvette Ray on February 10, 1973, and that at such time she made a statement concerning the defendant Ford leaving the Ford house at approximately 11:00 p. m. He testified that the statement concerned whether or not she went with defendant Ford at that time, her statement being that she did not go with him.

Mark McClendon was called as a rebuttal witness on behalf of the State and he testified that on the night of the arrest of the defendants, Ford and Jackson, he had occasion to prepare defendant Ford for jail. He stated that afterwards he went directly to the fingerprint room, inventoried and marked the money, vouchers and checks, thereafter dusting the stamp dispenser for latent prints. He further testified that later he took defendant Ford's fingerprints and thereafter he photographed and took fingerprints of defendant Jackson.

Don Jones was called as a rebuttal witness on behalf of the State. He testified that in the early morning hours of December 2, 1972, he had occasion to observe Mark McClendon in the identification room of the Police Department counting some money and adding up the checks. Thereafter he observed McClendon taking prints off of a stamp machine.

The State rested and then both defendants rested.

■ The defendant's first proposition of error asserts that the trial court erred in allowing at trial the in court identification of defendant Ford, for the reason that he was subjected to an improper pretrial in custody exhibition without the presence of counsel and because the court room identification subsequent to the pretrial, in custody exhibition was a denial of due process. In support of this proposition of error the defendant contends that a pretrial, in custody exhibition of an accused to an identifying witness is a critical stage of criminal proceedings and that the defendant is entitled to the presence of counsel, unless waived. The rule of law is well established and we have so previously held that the right to counsel attaches only when the accused has been formally charged with the commission of a crime so that an adversary criminal prosecution is pending against him. See, Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed. 2d 411 (1972) and Stewart v. State, Okl. Cr., 509 P.2d 1402 (1973). Since the pretrial in custody exhibition in the case at bar was held on December 2, 1972, and since a preliminary information was filed against defendant Ford on December 4, 1972, no right to counsel had attached at the pretrial in custody exhibition. Therefore, we find this contention to be without merit.

■ In further support of his first proposition of error, the defendant contends that the pretrial, in custody exhibition was so impermissibly suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law and that therefore the witness should not have been allowed to identify the defendant Ford during the trial. This is a claim which must be evaluated in light of the totality of the surrounding circumstances. See, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Viewed in that context, we find the claim untenable. After examining the entire rec-

ord we find that the chief witness Stine's in court identification was solely based upon his initial contact with the two men at the motel whereby he could make a positive identification of them in court. This fact is illustrated by the following excerpt from the evidentiary hearing wherein it states:

"Q. Mr. Stine, I hate to keep going over this but this is very, very important. This will mean a lot to these two young men. Is it not your testimony that you saw enough of those two men at the motel to make a positive identification of them today?

"A. Yes, sir."

We further observe that this matter was before the trial judge during the evidentiary hearing at trial, at which time he heard the testimony of the facts and circumstances surrounding the incident in question, along with the demeanor of the witnesses, and thus properly concluded that the in court identification was proper. We fail to find that the trial court abused its discretion in permitting the in court identification.

Even assuming that the trial court committed error in the admission of the in court identification, under the rules governing harmless error, as enunciated in Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967) and Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), we find this alleged error harmless and without merit.

■ The defendant's second proposition of error asserts that the trial court erred in overruling the defendant's motion to suppress all the evidence and testimony against the defendant for the reason that the defendant was arrested without probable cause and that any evidence obtained as a result of the arrest was unlawfully seized and should have been suppressed.

In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), citing with approval Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed.2d 543, 555, the Supreme Court of the United States defined probable cause in the following terms:

"Probable cause exists where 'the facts and circumstances with [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."

For a more in-depth discussion of this proposition of error, see Grimes v. State, Okl.Cr., 528 P.2d 1397 (1974).

In view of the description of the robbers and the circumstances surrounding the in custody detention of the defendants by the troopers, we are of the opinion that sufficient evidence existed to warrant the officers to believe that an offense had been committed, and that the defendant had committed said offense. Thus, we find defendant's second proposition of error to be without merit.

■ Defendant's third proposition of error asserts that the trial court improperly denied defendant's motion for severance. This Court in the case of Brumbelow v. State, Okl.Cr., 488 P.2d 1298 (1971), held that:

"While Title 22 O.S.1968, Section 439, provides for relief from prejudicial joinder, the granting of such relief lies within the discretion of the trial judge; and unless an abuse of discretion is shown, such complaint will not be considered as being sufficient for reversal of the conviction. In this case we find that the trial judge did not abuse his discretion. The record reflects that all parties were heard on the Motions for Severance and failed to convince the court that the defendants would be prejudiced by a joint trial.

"Also, we fail to find any affidavits or other supporting evidence to show how the joint trial would prejudice the de-

fendants, and note the following second paragraph of the Syllabus in the case of Nichols v. State, 76 Okl.Cr. 178, 135 P. 2d 352 (1943):

'Application for a severance must state sufficient grounds therefor and be supported by oral evidence or affidavits, and must be made before the impaneling of the jury is begun.' "

Thus, in light of the absence of any supportive evidence of the defendants for their application for severances, we find defendant's third proposition of error to be without merit.

■■ Defendant's fourth proposition of error asserts that the defendant was denied a fair and impartial trial as a result of certain improper statements made by the District Attorney in his closing argument before the jury. In support of his argument the defendant contends that the prosecutor exceeded the generally recognized limits of closing argument, and went outside the record for the purpose of appealing to the passion and prejudice of the jurors by his argument as to what the legislature saw fit to do (Tr. 224) and also his reference to the defendant's visiting the scene of the alleged robbery to "case the place out" (Tr. 225). The rule of law is well established that during closing argument the prosecutor has a right to discuss fully, from his standpoint, the inferences and deductions which may be reasonably drawn from the evidence presented at trial. See, Carr v. State, Okl.Cr., 514 P.2d 413 (1973). We have further held that mention of incompetent or immaterial matters in the prosecution's closing argument affords no ground for reversal of conviction unless it appears that the statement or statements were manifestly prejudicial. See, Battle v. State, Okl.Cr., 478 P.2d 1005 (1970). After a careful examination of the prosecutor's statements of which the defendant now complains, we find that in light of the entire record in no way did such statements prejudice the defendant. Thus, we find the defendant's fourth proposition of error to be without merit.

■ Defendant's fifth proposition of error asserts that the trial court erred in its failure to instruct the jury that evidence of the defendant's previous convictions could be considered only as to how it might effect the defendant's credibility as a witness. We have consistently held that where counsel is not satisfied with instructions that are given, or desires the court to give any particular instruction, or to more definitely or sufficiently state any proposition embraced in the instruction, it is the duty of counsel to prepare and present to the court such desired instructions and to request that they be given. In the absence of such request, the Court of Criminal Appeals will not reverse the case if the instructions generally cover the subject matter of inquiry. See, Schapansky v. State, Okl.Cr., 478 P.2d 912 (1970). The record does not reveal that the defendant objected to the instructions, nor did he submit requested instructions to the court for consideration. Thus, in light of the absence of any objections or requests, we find the defendant's fifth proposition of error to be without merit.

■ The defendant's final proposition of error asserts that the verdict is not supported by the evidence. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See, Jones v. State, Okl.Cr., 468 P.2d 805 (1970). After an examination of the entire record we find competent evidence upon which the jury found the defendant guilty. Thus, we find the defendant's last proposition of error to be without merit.

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, affirmed.