Robert Steve LEPPKE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–359.

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1977.

Rehearing Denied Feb. 8, 1977.

James W. Fransein and Robert S. Lowery, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Harold T. Garbin, Jr., Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge.

Appellant, Robert Steve Leppke, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Washington County, Case No. CRF–74–452, for the offense of Robbery by Fear, in violation of 21 O.S.1971, § 791. His punishment was fixed at eleven (11) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Margaret E. Richardson, who testified that on February 12, 1974, at approximately 10:00 p. m., she and her husband were alone in their home located about ten miles south of Bartlesville, when they heard a knock on their front door. As both arrived at the door, it was opened and in stepped two men, one large in stature, the other smaller, each brandishing a pistol. They had their heads

covered with ski masks and their hands with gloves. She described the dress and approximate size of both men: the larger man being 190 pounds and almost six foot tall, and dressed in khakis; the smaller man was about five foot six or seven and about 135 pounds, and dressed in dark clothing. Mrs. Richardson said she was ordered into the den with the smaller man, while her husband went with the larger man. She testified the larger man did nearly all the talking. When Mr. Richardson and the larger man returned to the den, Mrs. Richardson testified she noticed the larger man no longer wore his gloves and described his hands as "well groomed," with no evidence of hard work. The larger man then took Mrs. Richardson's diamond ring. Mr. Richardson then handed his billfold to the larger man. During this exchange Mrs. Richardson said she could observe the eyes, nostrils and teeth of the larger man. The larger man next removed approximately $80.00 from her purse, and after binding both Mr. and Mrs. Richardson, the two men left the house. The witness described the head of the larger man as well-rounded and a wide forehead. He had teeth that were very white and even, large eyes, and a light complexion, although she could not testify as to the color of the larger man's eyes. His eyebrows were described as "bushy." His physical characteristics she described as broad shoulders, big arms, large through the abdomen and full thighs. She then identified the defendant as the larger man who was in her house that night. The witness testified that in May, 1974, she was shown more than a dozen photographs by the Sheriff and picked out one that resembled the larger man. She next saw that man during a court hearing on September 25, 1974.

On cross-examination the witness testified that the two men were inside the house about twenty minutes. Mrs. Richardson testified that she was shown a group of different (about six) photographs at the preliminary hearing in September, 1974, and the defendant's photo was among them. The defense asked the defendant to stand and Mrs. Richardson said he was the same man who entered her house on February 12, 1974, although he had lost some weight.

On re-direct, Mrs. Richardson testified she made her identification in the courtroom that day based on the man who entered her house the night of February 12, 1974, not on any photographs she had been shown.

The next witness was Garland C. Richardson, husband of the prior witness. He described the two men: over six feet and over 200 pounds for one man and five foot nine and 150 pounds for the other man. He said the ski masks worn by the men were so tight he could pick out their features under those masks. He testified that $317.00 was taken from his wallet by the larger man and placed the value of his wife's diamond ring at $5,000.00. He testified to having taken college courses on the human body as a physical education student, and he described the larger man as large in stature, big shoulders, heavily muscled arms and back, heavy thighs and buttocks, distinctive ears, distinctive forehead, and he added that "this cap accentuates the ability to describe the gentleman." Richardson testified that when he observed the defendant in August, 1974, he "very definitely" recognized his walk as that of the larger man who entered his house on February 12, 1974. He also recognized the defendant's voice as belonging to the larger man. He said his courtroom identification was based on events of February 12th, and added, "the pictures (he was shown) only confirm it."

On cross-examination Richardson testified that he observed the defendant on August 14th through a one-way mirror in a one-on-one identification at the police station.

The next State's witness was Wayne Vermeulen, who testified that he resides at the Arkansas Penitentiary and had been convicted in Arkansas of the crimes of Grand Larceny and Burglary, and is serving a sentence of eight years. He also was convicted of a federal crime of Possession of Firearms, he said. Vermeulen said he was five foot nine inches tall and weighed 135

pounds. He said he had known the defendant for one and one-half to two years, and met him in the Sin City Club in Tulsa. Out of the jury's hearing, the Assistant District Attorney said the witness came forward on his own volition and no promises were made to him.

The court granted the witness immunity from prosecution after he pleaded the Fifth Amendment. The witness then admitted that he was the John Doe named in the Information, that he did take part in the robbery at the Richardson's house. He said the idea for the robbery was born at the Sin City Club which was owned and managed by the defendant and that the defendant himself conceived the plan. He said a Cliff Blaylock was also involved, and that he (Blaylock) is currently in the Arkansas Penitentiary. He testified that on the evening of the robbery the three met in the office of the defendant at the club and there they secured ski masks, tape and gloves. He said the defendant had obtained two .38 caliber guns. Vermeulen said he stole a car in Bartlesville, he described the ski masks they wore as navy blue in color and tight-fitting, especially tight-fitting on the defendant. Vermeulen said he was dressed in blue jeans and a green army shirt. He said the defendant was wearing a pair of charcoal gray, nylon or rayon slacks. He said while he and the defendant entered the Richardson's house, the third man, Blaylock, remained in the car. He described the geographical layout of the Richardson's house and of overhearing a telephone conversation of Mr. Richardson just before they entered the house. The rest of his testimony fairly followed that already given by Mr. and Mrs. Richardson as far as the movements of the Richardsons and the two men in and around the Richardson's house. He said that when they left the Richardson's house they returned to the defendant's office in the Sin City Club to divide the stolen money. He also identified the defendant as the Robert Leppke with him that night.

He said that his appearance in court was voluntary, although he acknowledged that he was subpoenaed. He said he voluntarily told authorities about his role in the robbery and identified Leppke as also taking part in it. He said he was promised nothing in return for his testimony, although the defense attorney noted that the witness received immunity from prosecution for his testimony.

On cross-examination, he testified that some time after the robbery the defendant came to Springdale, Arkansas, to tell him and Blaylock that he (the defendant) had been arrested for the Richardson robbery. He admitted that the height and weight of Blaylock are similar to the defendant. Thereafter, the State rested.

The defense called as its first witness Phillip Billie Jack Bryant, II, who stated he was a bartender at the Sin City Club in Tulsa, managed by the defendant, at the time of the robbery. He testified he was "positive" that the defendant was in the club on the night of February 12, 1974, at about 8:00 p. m., but he did not recall how long the defendant stayed at the club that night.

The defense next called Jerry Hazel Leppke, the defendant's wife, who stated she was employed by a petroleum company during the day, and that she and her husband worked as managers of the Sin City Club in the evenings during the month of February, 1974. She said she could remember the night of February 12, 1974, because her husband's Uncle Jack was ill, "on the verge of dying," and in fact he did die two or three days later. She said she arrived at the club at 8:00 p. m. on February 12th and on most nights went home at 10:30 p. m. She testified that her husband had not left the club that night of February 12th for one or one and a half hours, or more. She testified both she and her husband knew Cliff Blaylock through the club. She said she and her husband left the club about 2:30 a. m. the morning of February 13, 1974, the night of the robbery. She said she remembered that week in February because her brother-in-law, Jack Benson, came to town, and she picked him up at the airport on February 12th.

The next defense witness was Jack Benson. He testified he arrived at Tulsa Airport at 7:55 a. m. on February 12th, and was picked up by his sister-in-law, Mrs. Leppke. He said he dropped her off at her job and went to the house of his brother, the defendant. He testified he and his brother went to the club the night of February 12th at about 8:00 p. m. or 8:30 p. m., and his brother was out of sight that evening for no more than ten minutes at a time. He testified that the drive from the Sin City Club to the Richardson house and back takes about three hours. He said he, the defendant and Jerry left the club at 2:00 a. m. that morning.

The next witness for the defense was the defendant, Robert Leppke. He testified he had met Mr. Richardson in 1971, when he asked him about hauling hay. He testified that on the day of February 12, 1974, he was six feet tall and weighed 246 pounds, and that he now weighs 205 pounds. He said he was in his club at 8:00 p. m. on February 12th and was there when it closed at 2:00 a. m. He said he knew Wayne Vermeulen when he was introduced to him at his club, and has seen him at most six times since then. He said he usually goes to Arkansas to watch the Tulsa University-Arkansas University football game and on one trip he stopped in Springdale to say hello to Cliff Blaylock and said he saw Vermeulen who worked for Blaylock at the time. He said he remembers February 12th because his uncle died shortly thereafter. He said he had a forty-four inch waist in February, 1974, not the trim waist described by Richardson.

On cross-examination he said he knows Cliff Blaylock socially, that Blaylock had been to his house once or twice. He said he believes one of the Blaylock brothers introduced him to Wayne Vermeulen.

The defense rested and the State called as rebuttal witness, Wayne Vermeulen. He testified that in August, 1974, the defendant and Cliff Blaylock came to Springdale, Arkansas, and called him off the job. The defendant's wife was with him in the car. He did not see Jack Benson in the Sin City Club on the night of the robbery. On cross-examination, he said he had been to the defendant's house on three occasions. Thereafter, the State rested.

The defendant's first assignment of error is that the trial court should have suppressed the in court identification of the defendant by the Richardsons, due to improper pretrial identification of the defendant.

■ This is a claim which must be evaluated in light of the totality of the surrounding circumstances. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Viewed in this context we find the claim is without merit. Viewing the record as a whole, we find Mr. and Mrs. Richardson were in the presence of the defendant for about twenty minutes, during which time they testified they had ample opportunity to observe his physical characteristics. Their testimony at trial was very specific. They also testified that their in-court identification was based on their personal observations at the time of the robbery, not on the pretrial identifications.

*Ford v. State*, Okl.Cr., 532 P.2d 89 (1975) is a weaker fact situation than the case at bar, yet we upheld it. In *Ford*, the robbery victim was called down to the police station to view two captured suspects, later convicted of the crime. He identified each one out of the presence of the other, and alone. The trial court held a pretrial hearing to determine the identification issue, and overruled the defendant's motion to suppress in court identification. This Court said:

"  .  .  . We fail to find that the trial court abused its discretion in permitting the in court identification."

We then found that assignment of error to be without merit.

In *Hazelwood v. State*, Okl.Cr., 538 P.2d 1072 (1975), the robbery victim examined six photographs of individuals of similar size and build, and picked out the defendant. His in court testimony recalled in detail the features of the defendant. We concluded there, that the in court identification was based on the witness' observation of the defendant at the scene of the rob-

bery, rather than on the pretrial identification procedure.

■ The Supreme Court of the United States has held that a pretrial identification procedure is unconstitutional if it "was so unnecessarily suggestive and conducive to irreparable mistake identification that (the accused) was denied due process." *Stovall v. Denno,* supra. If the pretrial confrontation or viewing of the accused is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" then the witness having viewed the accused under such suggestive circumstances, may not be allowed to identify the accused during trial. *Simmons v. U. S.,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We find this not to be the case here, based on the long time the Richardsons had to observe the defendant and their detailed identification they gave at the trial. The photograph identification was conducted in an unprejudicial manner, and while the viewing in the police station through the one-way mirror perhaps should not have taken place, we view it as harmless error in light of all the other circumstances.

Defense counsel points to the Richardsons' sworn statement taken nine days after the robbery, the preliminary hearing testimony taken seven months after the robbery, and the trial testimony taken eighteen months after the robbery, and calls the comparisons "remarkable," and "miraculous" because the Richardsons' descriptions of the robbers became more detailed with each examination. We note, however, that Mr. Richardson pointed out the defendant, at the preliminary hearing, as "very definitely" the larger man who robbed him, and he testified, "I did observe him carefully as to physique, movements, things like that," but he was only asked to elaborate on that statement at trial. He was asked about his viewing of the defendant at the police station:

"Q. Is your identification here today of Mr. Leppke as the man who robbed you, is that based on the picture of the man you saw in the photographs, or the man, the viewing you had of a man on the night of February 12th?

"A. Well, of course, my identification is on the 12th. The pictures only confirm it. The identification was back there, plus here."

We find the defendant's first assignment of error to be without merit.

The defendant's second assignment of error is that the trial court abused its discretion in overruling the defendant's application for continuance based on the State's endorsement of an additional witness two days prior to trial. The defendant claims he did not receive personal word of the endorsement until the day before trial and could find out nothing in that brief time for use in effective cross-examination. He cites as authority *Plumlee v. State,* Okl.Cr., 361 P.2d 223 (1961), as to the good faith of the county attorney in endorsing witnesses after trial has begun.

But *Plumlee* also agrees with *Evans v. State,* Okl.Cr., 312 P.2d 908 (1957), which states in the third paragraph of the Syllabus:

"The trial court may permit the name of an additional witness to be endorsed on the information even after the trial has begun; and the Criminal Court of Appeals will not interfere with the action of the trial court unless the record clearly shows an abuse of discretion."

In the body of the opinion in *Evans v. State,* supra, we said that *Paschall v. State,* 96 Okl.Cr. 198, 252 P.2d 175, set forth the procedure for the surprised defendant to follow:

" 'If defendant's counsel is surprised at such action and such endorsement of an additional witness requires a production of further testimony by defendant, he should withdraw his announcement of ready for trial and should file a motion for a postponement or a continuance in which he should set out the facts constituting such surprise, and the other evidence, if any, he could produce to rebut the testimony of such additional witness if the trial of the case was continued.

Where he fails to do this the error, if any, is waived.' "

▋ Defense counsel knew of the endorsement the day before the trial began. He announced ready for trial on the first day of trial, and did not later move to withdraw that announcement. When the endorsed witness was called to testify, counsel asked the court to dismiss any testimony he might make. No motion for continuance was made until after the State had rested its case. Accordingly, the second assignment of error is without merit.

▋ The defendant's third assignment of error is that the prosecutor's conduct during the trial and his improper statements appealed to the passion and prejudice of the jury and so denied the defendant a fair and impartial trial. We disagree. Defendant points to the witness Vermeulen taking the Fifth Amendment while on the stand and argued this "appealed to the passions and prejudice of the jury." There is no evidence in the record indicating the prosecutor knew that the witness would plead the Fifth Amendment on the stand, so we cannot say he was guilty of misconduct. But even if the prosecutor had known, we have not been convinced that the witness' statement and the prosecutor's conduct "influenced the verdict against the defendant." *Samples v. State,* Okl.Cr., 337 P.2d 756 (1959).

▋ Counsel points to questioning of defendant's wife as to why she did not report to authorities the fact that the defendant had been in the club all during the night in question. The Court, on numerous occasions, has distinguished the right of an accused to remain silent from the assertion of that right as applied to third persons. See, *Walker v. State,* Okl.Cr., 550 P.2d 1339 (1976). Counsel points to comments in the closing argument of the prosecutor. However, no proper defense objections were made to the statements by the prosecutor and if proper objections are not made during the course of the trial, the defendant is deemed to have waived any right to raise

his objections on appeal. As we said in *McCall v. State,* Okl.Cr., 539 P.2d 418:

" . . . It is a well established rule that when an objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection, together with the request that the jury be instructed to disregard the improper statement . . . "

We, therefore, find the defendant's third assignment of error to be without merit.

The defendant's fourth assignment of error goes to the proposition that there was insufficient evidence to corroborate the testimony of the admitted accomplice, Wayne Vermeulen. This is clearly incorrect if the Richardsons' testimony, and especially their identification of the defendant, is to be believed. The defendant speaks of "circumstantial" evidence, but surely he would not contend that the Richardsons' identification is circumstantial.

▋ But even circumstantial evidence can be sufficient to corroborate an accomplice's testimony. *Brown v. State,* Okl.Cr., 518 P.2d 898 (1974).

In *McManus v. State,* Okl.Cr., 516 P.2d 277 (1973), we stated:

" . . . The rule generally stated provides that when no evidence except that of the accomplice tends to connect defendant with a burglary, the evidence is insufficient to sustain a jury's verdict. . . . "

The *McManus* test has clearly been met by the testimony of Mr. and Mrs. Richardson, who were quite definite in their identification of the defendant.

▋ The required corroboration need not encompass every fact. As we said in *Hambrick v. State,* Okl.Cr., 535 P.2d 703 (1975):

" . . . Clearly, the law in this State states that a defendant may not be convicted on the uncorroborated testimony of an accomplice. It is also the law in this State that an accomplice's testimony need not be corroborated as to every material point. If the accomplice is corroborated as to one material fact, or facts, by independent evidence tending to connect

the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. . . . "

In the case at bar, witness Vermeulen concurred with the Richardsons' testimony as to the time and date of the robbery, the physical description of the robbers, the sequence of events that occurred in the Richardsons' house, and even as to overhearing Mr. Richardson's long-distance telephone conversation before he and the defendant entered the house.

 This Court will view corroborating evidence in the strongest light. In the early case *Key v. State,* 38 Okl.Cr. 169, 259 P. 659 (1927), we held, in the third paragraph of the Syllabus:

> "Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

And, in *Haas v. State,* 37 Okl.Cr. 335, 257 P. 1115 (1927), we held, in the first paragraph of the Syllabus:

> "Where there is evidence in corroboration of an accomplice, tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury."

*Collier v. State,* Okl.Cr., 520 P.2d 681 (1974), had a similar fact incident to the case at bar. In *Collier* the accomplice was given immunity from prosecution to testify against the defendant. The only corroborating evidence (the victims could not identify the defendant) was a description of the defendant's car and the defendant's initials given to the police by the accomplice. The sheriff found the car in question with the defendant inside and this Court affirmed that conviction. As stated above, the present fact situation is far stronger than *Collier,* and so we find no merit in defendant's fourth assignment of error.

For the defendant's fifth assignment of error, he states that the accumulation of errors and irregularities in the trial, when considered as a whole, deprived him of a fair trial under constitutional due process guarantees. This Court has ruled before that when the prior assignments of error have been found without merit, so will an assignment of this nature. *Murray v. State,* Okl.Cr., 556 P.2d 635 (47 O.B.J. 2726).

For the above and foregoing reasons, the judgment and sentence appealed from is accordingly *AFFIRMED.*

BLISS, J., concurs.

BRETT, P. J., dissents.