**Thomas Lee HAYS, a/k/a Sonny Hays, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–77–555.**

Court of Criminal Appeals of Oklahoma.

Aug. 28, 1980.

Rehearing Denied Oct. 2, 1980.

Bill Settle, Settle & Landrum, Muskogee, for appellant.

Larry Derryberry, Atty. Gen., Ross N. Lillard, III, Asst. Atty. Gen., Jan Eric Cartwright, Atty. Gen., David W. Lee, Asst. Atty. Gen., Susan M. Otto, Legal Intern, for appellee.

## OPINION

CORNISH, Presiding Judge:

Thomas Lee Hays, also known as Sonny Hays, was convicted of the offense of Mur-

der in the First Degree in Muskogee County District Court, Case No. CRF–77–91. In the second stage of the trial, pursuant to Laws 1976, 1st Ex.Sess., Ch. 1, § 7, now 21 O.S.Supp.1979, § 701.10, et seq., the jury assessed the death penalty.

Laws 1976, 1st Ex.Sess., Ch. 1, § 7, now 21 O.S.Supp.1979, § 701.13, requires a review of the propriety of each death sentence imposed in Oklahoma. Although this review is in addition to any direct appeal by the appellant sentenced to death, this Court has consolidated both. Section 701.13 also provides for oral argument and submission of briefs by both the appellant and the State. Oral argument was held on November 14, 1979. At that time, both parties were granted permission to file supplemental briefs which have now been filed and made a part of the record herein. We have also examined the report of the trial judge and the exceptions filed thereto.

All of the evidence presented at trial was introduced by the State. The appellant exercised his constitutional right to remain silent and presented no evidence in his behalf.

On March 9, 1977, the victim of this crime, Everett Leonard Vance, was operating his shoe store at 107 West Broadway in Muskogee, Oklahoma. During the afternoon, the victim's parents stopped by the shop, leaving at approximately 4:55 p. m. About 5:10 p. m., Everett Vance called his wife at home and told her that he was planning to work late.

At about the same time the victim was calling his wife, Faye Bramlett encountered the appellant at the nearby intersection of Cherokee and Broadway. Following a brief discussion with Ms. Bramlett, the appellant proceeded south on Cherokee. The testimony of Mary Ann Dodson and Virginia Smith placed the appellant at the entrance of the Brass Rail Club at approximately 5:15 p. m., where he was apparently denied admittance. The location of the Brass Rail Club is approximately 180 feet from Everett Vance's shoe store.

The State's evidence again placed the appellant at the intersection of Cherokee and Broadway at 5:30 p. m. Appearing to be intoxicated and carrying a brown paper sack, the appellant staggered across the intersection in front of a car. Some teenagers in a car verbally taunted the appellant as he crossed the street in front of them. He then reached into the sack, pulled out a revolver, and pointed it at the boys. In an effort to leave the scene, the boys' car ran a red light and sped away.

The appellant's actions aroused the suspicions of Officer Ron Garrett, so he followed the appellant as he left the intersection. As the officer was maneuvering his patrol unit in an effort to head off the appellant, the appellant crossed the lot along the north side of a service station owned by Robert Edge. Mr. Edge was watching out the window of his station as the appellant took a black object from the sack he was carrying, tossed it into the bed of a truck parked on the station lot, and continued on his way. Officer Garrett apprehended the appellant a short distance away and arrested him on a public drunk charge. When arrested, the appellant was in possession of a brown paper sack containing a pair of old cowboy boots and $110.00 in loose bills.

After viewing the appellant's arrest, Robert Edge approached Officer Garrett and his backup patrolman and told them what he had seen. When the officers searched the bed of the truck indicated by Mr. Edge, they recovered a .38 caliber Llama revolver in a black holster. In the pistol the officers found one empty chamber, two spent cartridges, and three live rounds.

The appellant was taken to jail and booked on a public drunk charge. When his personal property was inventoried at the jail, he had $12.41, two different packages of cigarettes and two lighters.

At 7:30 p. m. Mrs. Vance and her daughter went to the shoe store because Mr. Vance had not answered the telephone, nor had he turned off the lights in the front part of the store, as was usual when he closed the shop at 5:30 p. m. They entered through the unlocked door of the store and discovered him lying in a pool of blood.

There were two bullet wounds in the victim's head. An autopsy performed on the deceased indicated that the fatal bullet had entered the right side of the victim's head below the ear and lodged inside the right side of the brain. A second bullet had entered the left side of the head just below the ear.

As a preliminary investigation at the murder scene progressed, suspicion focused on the appellant. Approximately one hour after the discovery of the murder, one of the officers returned to the scene of the appellant's arrest. In the top of a trash can located approximately 20 feet from the truck where the pistol was found, the officers discovered two more pairs of boots which still had price tags on them. As a result of this preliminary investigation, first degree murder charges were filed against the appellant the following day.

## I

In the first of five allegations of error, the appellant asserts the trial court improperly admitted State's Exhibits No. 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 18, and 19.[1] The basis of this contention is that the State did not properly establish a chain of custody for these exhibits. Consequently, the appellant argues there was a possibility for abuse and tampering with the evidence.

The record indicates that State's Exhibits No. 1, 5, 6, 7, 10, 11, 12 and 13 were either in the sack the appellant was carrying or on his person at the time of his arrest. When he was subsequently booked into jail on the misdemeanor charge, these items were taken from him and placed in envelopes for storage in the property room. Several hours later, when the appellant had become the focus of suspicion in the homicide case, the arresting officer returned to the station to inventory and mark these items as potential evidence in the homicide investigation. The items were then stored in the evidence room of the Muskogee Police Department.

Exhibits No. 2, 8 and 9 were removed from the bed of a truck which was parked on the lot of Robert Edge's service station. They were then given to Lieutenant Carter, who transported them to the police station, where he turned them over to Major Bounds. Because the evidence room was locked and the Major did not have access to it, he locked these exhibits in his office overnight. The next morning he checked the items into the evidence room. That same day, March 10, 1977, Detective Summers took these exhibits to the Oklahoma State Bureau of Investigation for examination. These items were received by the OSBI firearms and toolmark examiner, Tom Jordan, who conducted ballistics comparisons on them. All of these exhibits remained in his custody until the preliminary hearing. No testimony was introduced concerning the transportation or storage of Exhibit No. 14.

Exhibits No. 18 and 19 were removed from the head of the homicide victim during autopsy at the Muskogee General Hospital by Dr. William P. Chamberlain, the attending pathologist. He personally marked the slugs, placed them in labeled containers, and gave them to Mr. Gary Sturm, an investigator for the District Attorney's Office. Mr. Sturm, who was present at the autopsy, then turned the containers over to Detective Summers, who took them to the OSBI Crime Laboratory for analysis.

---

1. Admissibility of the following exhibits, introduced at trial, representing the following pieces of physical evidence, respectively, is raised on appeal:

Exhibit No.

| Exhibit No. | | |
|---|---|---|
| 1 | – | a blue coat worn by the appellant. |
| 2 | – | a .38 caliber Llama revolver. |
| 5 | – | a paper sack carried by the appellant at the time of his arrest. |
| 6 | – | an envelope containing $12.41. |
| 7 | – | $110.00 in cash found in the aforementioned paper sack. |
| 8 | – | three live .38 caliber rounds. |
| 9 | – | two empty .38 caliber cartridge cases. |
| 10 | – | a pack of Bel-Air cigarettes. |
| 11 | – | a Scripto lighter. |
| 12 | – | a pair of boots worn by the appellant at the time of his arrest. |
| 13 | – | a pair of boots the appellant was carrying in the paper sack. |
| 14 | – | the boots found in the trash can located near Robert Edge's service station. |
| 18 | – | .38 caliber slug removed from the head of the homicide victim. |
| 19 | – | .38 caliber slug removed from the head of the homicide victim. |

These exhibits, like Exhibits No. 2, 8, and 9, were also in the custody of Mr. Jordan until the time of the preliminary hearing.

In regard to establishing chain of custody, it is the general rule in this jurisdiction that the party who offers demonstrative evidence must show, to the satisfaction of the trial judge, that the circumstances of its custody provide reasonable certainty that there has been no alteration of or tampering with that evidence. *Hauschildt v. State*, Okl.Cr., 554 P.2d 77 (1976). However, we have made it clear that this burden does not require that all possibility of alteration, however slight, must be negated by the party offering the evidence. *Trantham v. State*, Okl.Cr., 508 P.2d 1104 (1973). Once it has been shown to the court that the evidence was preserved under circumstances reasonably certain to maintain its integrity, it is proper for the trial judge to admit the evidence and let what doubt there may be go to its weight. *Hauschildt v. State*, supra.

Admittedly, in this case, the prosecutors could have made a greater effort to elicit more complete testimony concerning the chain of custody of the exhibits in question. However, the State did establish that Exhibits No. 1, 5, 6, 7, 10, 11, 12 and 13 were taken from the possession of the appellant, placed in the jail property room, and then stored in the police evidence room. All of these exhibits were sufficiently labeled and/or identified by the persons dealing with them. Possession of Exhibits No. 2, 8 and 9 passed from the officer who found them to the officer who stored them overnight in his office and then to the detective who transported them to the crime laboratory for analysis. Exhibits No. 18 and 19 also came to the same crime laboratory after being removed from the deceased by the attending pathologist. He had given them to the investigator from the District Attorney's Office, who, in turn, had given them to the detective who transported them to the crime laboratory that same day.

The only exhibit for which the chain of custody was not completely established was Exhibit No. 14. Although there was admittedly a gap in the chain of custody because of the character of the exhibit, there was sufficient identification by the State's witness to permit its introduction into evidence. *Ervin v. State*, Okl.Cr., 580 P.2d 1002 (1978). A break in the chain of custody of a pair of cowboy boots with a price tag on them does not raise the same grave concern that a similar break would cause when dealing with contraband substances, wherein a chemical analysis is necessary for identification and a layman would be unable to identify the substance as the same substance taken under a particular set of circumstances. *Brown v. State*, Okl.Cr., 518 P.2d 898 (1974).

Consequently, the evidence in question was preserved under circumstances reasonably certain to maintain its integrity. The allegation that there was a possibility for tampering with the evidence is nothing but bare speculation. Therefore, the trial judge properly admitted the evidence and let whatever doubt there may be go to its weight.

II

The appellant also asserts that the trial court erred in refusing to grant his motion for a mistrial. During the cross-examination of Robert Edge, defense counsel made a motion for a mistrial and a motion to suppress Mr. Edge's testimony on the theory that his testimony was tainted by an improper lineup, that occurred the evening of the murder.

Mr. Edge testified that on March 9, 1977, at approximately 5:30 p. m., he noticed the appellant walking along the north side of his service station. He was observant because he thought the appellant might discard some trash on the station lot. He saw the appellant toss a black object into the back of a truck parked on the lot. He reported these observations to the police minutes later when he observed the appellant being arrested. This report resulted in the discovery of the murder weapon.

As the murder investigation progressed that evening and suspicion began to focus

on the appellant, Mr. Edge was asked to give a statement at the police station at about 9:30 p. m. At 9:45 p. m., Mr. Edge was taken to a room where the appellant was sitting with another man. He immediately identified the appellant as the man he had seen walking past his station earlier in the evening.

When the facts surrounding this one–on–one confrontation were brought out during the cross–examination of Mr. Edge, the trial court conducted an in camera hearing to further explore the matter. In this hearing, Mr. Edge testified that he based his in–court identification of the appellant on what he had seen at his service station and not on the confrontation at the police station. As a result, the trial court determined that Mr. Edge's testimony was admissible and overruled the appellant's motion.

It is common for law enforcement authorities to compel confrontation between a suspect and a victim or a witness to a crime in order to elicit identification evidence. However, this practice is riddled with innumerable dangers and variables which might seriously derogate from a fair trial. Unfortunately, the annals of criminal law abound with instances of mistaken identification. A major factor contributing to the high incidence of mistaken identification has been the degree of suggestion inherent to the manner in which law enforcement authorities present a suspect to witnesses for pretrial identification. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

A pretrial confrontation for purposes of identification may take the form of a lineup or, as in this case, the presentation of the suspect alone to the witness. This practice of showing a suspect singly to witnesses has been widely attacked as being improperly suggestive and a violation of due process.

■ Improper suggestiveness in a confrontation does not conclusively indicate, however, that the subsequent in–court identification was unreliable, thereby requiring exclusion of the testimony at trial. *McDaniel v. State*, Okl.Cr., 576 P.2d 307 (1978).

The question to be asked is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ In *McDaniel v. State*, supra, we reaffirmed our adoption of the guidelines set out by the United States Supreme Court in *United States v. Wade*, supra, to aid in determining whether an in–court identification was tainted by a pretrial confrontation. These guidelines include considerations of: (1) The prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any prelineup description and the defendant's actual description; (3) any identification of another person prior to the lineup; (4) the identification of the defendant by a photograph prior to the lineup; (5) failure to identify the defendant on a prior occasion; and, (6) the lapse of time between the alleged act and the lineup identification. It is also relevant to consider any facts which are disclosed concerning the conduct of the lineup. See also *Thompson v. State*, Okl.Cr., 438 P.2d 287 (1968).

■ If, under the "totality of circumstances" test, viewed in light of the aforementioned guidelines, it can be determined that a witness' in–court identification of the defendant is entirely based upon observations at the time of the incident, the testimony can be properly admitted, *McDaniel v. State*, supra. On previous occasions, we have permitted such an in–court identification of a defendant by a witness who had been exposed to a suggestive one–on–one confrontation because we found that the identification was independent of the confrontation. *Leppke v. State*, Okl. Cr., 559 P.2d 459 (1977), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977); citing *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and, *Ford v. State*, Okl.Cr., 532 P.2d 89 (1975).

■ This case presents a situation in which a witness was exposed to a sugges-

tive confrontation in a police station. The appellant did not have counsel present at the time of confrontation. However, the record indicates that the in-court identification was based on a prior personal observation, as opposed to the suggestive one-on-one meeting. Mr. Edge had ample opportunity to view the appellant in broad daylight as he was crossing the service station's lot. He was able to view the appellant again as he was being arrested. When writing his statement a few hours later, Mr. Edge gave a detailed account of the appellant's face and attire. The statement was given before the witness was taken into the same room with the appellant. Finally, the witness testified under oath at the in camera hearing, that his identification in court was based on his observations at the station and not at police headquarters.

■ The fact that the appellant did not have counsel present at the identification at the police station did not deny him due process of law, nor did it deprive him of his right to counsel at a critical stage in the proceedings. This is because the information charging him with murder was not filed until the next day. The right to counsel for in-person identifications does not attach until formal criminal proceedings have been initiated so that an adversary criminal prosecution is pending against the defendant. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

Under the totality of the circumstances, we hold that the trial court properly admitted Mr. Edge's in-court identification of the appellant. There appears to be no substantial likelihood of irreparable misidentification.

### III

The appellant next contends that portions of the prosecutor's closing remarks were inflammatory and highly prejudicial. It is argued that these remarks were comments on the appellant's failure to take the witness stand and violated the provisions of 22 O.S.1971, § 701. We disagree.

The record indicates that on several occasions in his closing argument the prosecutor argued that the State's evidence was undenied, unrefuted, or uncontradicted. The appellant maintains that the repetition of these statements exceeded the prosecutor's right to comment on the evidence to such an extent that it constituted a direct comment on his refusal to testify.

It is not unusual that during the course of a trial statements are made by counsel which would not be selected as models for a manual on trial procedure. This case is no exception. Nonetheless, a thorough review of the record satisfies this Court that no comments by the prosecutor were so improper as to deprive the appellant of a fair trial.

■ The prosecutor who would argue the merits of the State's case must sometimes walk a narrow line to avoid indirect reference to the defendant's failure to testify. No matter how delicately worded, a summation which points to the strength of the State's case points inevitably, albeit silently, to the weaknesses of the defendant's. However, unless a prosecutor's comments are of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify, they are not prejudicial. It has been held that where such comments are confined to arguing the strength of the case by stressing the credibility and lack of contradiction of the State's witnesses, the remarks will not be found to be a veiled comment on the defendant's failure to testify. *United States ex rel. Leak v. Follette*, 418 F.2d 1266 (2nd Cir. 1969), *cert. denied*, 397 U.S. 1050, 90 S.Ct. 88, 25 L.Ed.2d 665 (1970).

■ It is the general rule that when no evidence has been offered by the defense on a particular issue, it may be fairly said that the evidence is "undisputed," "uncontradicted," or "unrefuted." *Coots v. State*, Okl. Cr., 560 P.2d 592 (1977); *Bennett v. State*, Okl.Cr., 546 P.2d 659 (1976). However, the word "undenied" must be used cautiously. It carries with it a strong connotation that somehow the defendant himself has failed to rebut a particular point of evidence. Its

use brings a prosecutor perilously close to invading the defendant's right of silence, by disparaging his exercise of that right. *United States v. Sanders*, 547 F.2d 1037 (8th Cir. 1976).

■ To constitute reversible error, the statements made by a prosecutor that purportedly comment on a defendant's failure to take the witness stand must directly and unequivocally call attention to the failure of the accused to testify. *Dangerfield v. State*, Okl.Cr., 542 P.2d 1311 (1975), and *United States v. Reid*, 415 F.2d 294 (10th Cir. 1969). Furthermore, the comments must be such that the jury would naturally and necessarily understand that the statements could *only* be rebutted by the defendant personally. *Smith v. State*, Okl.Cr., 521 P.2d 832 (1974). After carefully reviewing the comments in question, we must conclude that although they come perilously close to impermissibility, the statements were not directly calling attention to the appellant's failure to testify, in violation of 22 O.S.1971, § 701. We find no error.

### IV

■ The trial court's exclusion of all prospective jurors who stated they could not impose the death penalty is raised as the appellant's fourth allegation of error. We need only to observe that the appellant did not object to the manner in which the trial court was conducting its voir dire, and attempts to raise the issue for the first time on appeal.

A penetrating inquiry was made of those prospective jurors who manifested a personal objection to the imposition of the death penalty. Such examination followed the questioning approved in *Jones v. State*, Okl.Cr., 542 P.2d 1316 (1975). On appeal, the appellant has failed to cite any specific instance where veniremen were arbitrarily excluded. This Court has recognized that objections must be made in order to preserve error for appeal. *Gaines v. State*, Okl.Cr., 568 P.2d 1290 (1977); *Thigpen v. State*, 96 Okl.Cr. 309, 253 P.2d 1083 (1953). The defense counsel cannot lie behind a log, fail to preserve his objection at trial, and

now raise an issue for the first time on appeal. The error, if any, is waived.

### V

■ Finally, the appellant asserts that in view of the way the jury was selected in this case the imposition of the death penalty constitutes cruel and unusual punishment in contravention of the Eighth Amendment of the United States Constitution. The previous discussion fully explains why we find no significant error in the manner in which the jury in this case was selected. The imposition of the death sentence herein, in light of the above findings, would not constitute cruel and unusual punishment. Nor is the death penalty per se a violation of the Eighth and Fourteenth Amendments, when properly imposed pursuant to a judgment and sentence of murder in the first degree. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ Laws 1976, 1st Ex.Sess., Ch. 1, § 7, now 21 O.S.Supp.1979, § 701.13, ¶ C, requires this Court to make three determinations in addition to consideration of the appellant's allegations of error. We have carefully read the record and given careful consideration to the arguments presented by both sides in their original and supplemental briefs and during oral arguments and we hold:

1. That the sentence of death was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." See Section 701.13, ¶ C, 1. This was an unusually cruel killing. The victim lived in Muskogee, and his shop was frequented by numerous residents of the area. While public feeling would be strong under such circumstances, a careful reading of the transcript finds it devoid of prejudice or bias. We find the appellant was given a fair and impartial trial.

2. That the evidence supports the existence of the statutory aggravating circumstances found by the jury. See 21 O.S. Supp.1979, § 701.12. These aggravating circumstances include: (1) the appellant knowingly created a great risk of death

to more than one person; (2) the murder was especially heinous, atrocious, or cruel; and (3) the existence of a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society.

3. That the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.[2]

For all the reasons set forth above, we are of the opinion that the judgment and sentence appealed from should be and the same is hereby *AFFIRMED*.

BRETT, and BUSSEY, JJ., concur.

2. Most recently in *Eddings v. State*, Okl.Cr., 616 P.2d 1159 (51 O.B.A.J. 810, C–78–325, March 21, 1980), the first case considered under the new death penalty statute, we affirmed the death penalty of a defendant who at the age of sixteen murdered an Oklahoma Highway Patrol Officer with a shotgun as he attempted to make an investigatory traffic stop.

In *Breedlove v. State*, Okl.Cr., 525 P.2d 1254 (1974), a jury imposed the death penalty where the defendants robbed a grocery store and fatally shot all three persons present to avoid later identification. This Court later·commuted the sentences of all three defendants to life imprisonment in line with United States Supreme Court decisions. See the following cases involving the same robbery–murder: *Carolina v. State*, Okl.Cr., 524 P.2d 347 (1974); *Draper v. State*, Okl.Cr., 527 P.2d 602 (1974).

Another death penalty conviction for the murder of a service station operator following an armed robbery was affirmed in *Tilford v. State*, Okl.Cr., 437 P.2d 261 (1968). Following the robbery, the wounded operator–victim was forced into a car, shot several more times and finally abandoned on the pavement.

Another similar case was *Oxendine v. State*, Okl.Cr., 350 P.2d 606 (1960). There, an armed robbery was completed and the robbers locked the husband and wife victims, tied and gagged, in the closet of their apartment. The robbers then decided to open the closet and began firing a pistol, hitting the husband and fatally shooting the wife. The death penalty was affirmed.

Considering the gravity of these similar offenses, we conclude the penalty imposed in the case at bar was not excessive.