James Glenn ROBEDEAUX, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–86–463.

Court of Criminal Appeals of Oklahoma.

Dec. 20, 1993.

Rehearing Denied Feb. 10, 1994.

Opio Toure, Cindy Foley, Asst. Public Defenders, Oklahoma City, Trial Counsel, and Pete Gelvin, Asst. Public Defender, Oklahoma City, Appellate Counsel, for appellant.

Robert Macy, Dist. Atty., Tom Colbert, Asst. Dist. Atty., Oklahoma City, Trial Counsel, and Susan Brimer Loving, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Oklahoma City, Appellate Counsel, for appellee.

## OPINION

LUMPKIN, Presiding Judge:

Appellant, James Glenn Robedeaux, was tried by jury and convicted of the crime of Murder in the First Degree (21 O.S.Supp. 1982, § 701.7), Case No. CRF–85–6362 in the District Court of Oklahoma County. The jury recommended the death penalty and the trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals.

Appellant was found guilty of the first degree murder of Nancy McKinney. The decedent was last seen alive on September 22, 1985, at the apartment she shared with Appellant. In late December 1985, and early February 1986, various body parts, identified as having come from the decedent, were found in Logan County. Further facts will be presented as necessary.

## PRE–TRIAL ISSUES

■ In his first assignment of error, Appellant alleges the trial court erred by overruling his demurrer to the information. Appellant specifically claims the information failed to describe the commission of an imminently dangerous act and failed to detail precise facts that underlie the crime charged. The amended information used at trial provided in pertinent part:

[T]he crime of murder in the first degree was feloniously committed in Oklahoma County, Oklahoma, by James Glenn Robedeaux who wilfully, unlawfully and with malice aforethought, killed Nancy Rose Lee McKinney by beating and cutting her with an unknown object, inflicting mortal wounds which caused her death ... contrary to the provisions of section 701.7 of Title 21 of the Oklahoma statutes ... (O.R. 135).

■ It is well settled that when a defendant pleads to an information and proceeds to trial, he waives his right to attack the sufficiency of the information on appeal. *Davis v. State,* 792 P.2d 76, 80 (Okl.Cr.1990). Appellant entered his plea at a formal arraignment on March 4, 1986. He subsequently filed a demurrer to the information on April 15, 1986. The trial court overruled Appellant's demurrer the next day. Because Appellant did not file a timely objection to preserve alleged errors for appellate review, we limit our inquiry to ensuring no defects exist which go to the jurisdiction of the trial court, as such errors may not be waived. *Harjo v. State,* 797 P.2d 338, 342 (Okl.Cr. 1990).

In *Miller v. State,* 827 P.2d 875 (Okl.Cr. 1992), the majority of this Court stated that the test used to determine the sufficiency of an information in conferring jurisdiction on

the trial court is whether: (1) it contains every element of the offense to be charged and (2) it sufficiently apprises the defendant of what he must be prepared to meet. *See also Lamb v. State,* 626 P.2d 1355, 1356 (Okl.Cr.1981). The elements of first degree murder are: (1) the death of a human (2) which is unlawful (3) committed by the defendant (4) with malice aforethought. *See* 21 O.S.Supp.1982, § 701.7. Although the information in this case was amended three (3) times for the purpose of making minor changes, the information from the very start sufficiently contained the elements required by *Miller.*

As to the second part of the *Miller* test, we note the information advised Appellant that he was charged with the murder of a woman who was beaten and dismembered. Appellant complains that the information should have provided more details of the crime, such as the object used to commit the offense, and its actual location. As the majority stated in *Miller,* however, the test of sufficiency does not focus on whether the information could have been made more certain. 827 P.2d at 879. We examine the information for practical, rather than technical considerations, as hairsplitting is to be avoided. *Davis,* 792 P.2d at 81. Accordingly, we find that Appellant was properly placed on notice of the relevant criminal offense and the circumstances surrounding its commission. He has failed to show how the omission of additional facts in the information prejudiced his defense. This assignment of error is therefore denied.

## JURY SELECTION ISSUES

In his second assignment of error, Appellant contends that he was denied a fair trial because the jury selection process systematically excluded persons over the age of 70 and racial minorities, thus resulting in a jury not composed of a cross-section of the community. Appellant argues that persons over the age of 70 are less likely to impose the death penalty due to their advanced age and greater appreciation of death.

■ In *Moore v. State,* 736 P.2d 161, 165 (Okl.Cr.), *cert. denied* 484 U.S. 873, 108 S.Ct.

212, 98 L.Ed.2d 163 (1987), we stated that *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held that a defendant must establish a prima facie case in order to show he was denied a jury drawn from a fair-cross section of the community. Appellant has failed to make such a prima facie showing in the instant case, as he has not shown that this exemption from jury service excludes a sufficiently numerous and distinct group, that representation of this group in venires is not fair and reasonable in relation to the number of such people in the community, and that this underrepresentation is due to the systematic exclusion of the group in the jury selection process. *See Romano v. State*, 847 P.2d 368, 376 (Okl.Cr. 1993); *Sellers v. State*, 809 P.2d 676, 682 (Okl.Cr.1991); *Fox v. State*, 779 P.2d 562, 566 (Okl.Cr.1989).

█ Appellant also argues the jury selection process at the time should have been changed to raise minority representation on venires, hence increasing the likelihood the defendant will have a person of his own race on the jury. Although Appellant, as an American Indian, discusses racial minorities in general terms, he asserts that he was deprived of a jury with an individual of his own race. He further argues that the system of selecting jurors from the voter registration lists should have been replaced by the system now used in which jurors are chosen from lists of persons holding driver's licenses.

Appellant's argument must fail for several reasons. In *Fox v. State*, 779 P.2d at 566 we stated:

> When a defendant asserts this form of denial of equal protection, he must show that the procedures used to call his jury "resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied". (citation omitted).

Appellant's evidence before trial predominantly focused on the underrepresentation of American Indians in juries, but Appellant did not prove that they, or any minorities, are singled out for different treatment under state law. Therefore, he has failed to reach the first step in establishing systematic exclusion of this group.

Further, the previous system of randomly choosing a jury pool from lists of registered voters did not include race as a criteria for selection. In *Fox*, we recognized that the system of drawing names of registered voters, if carried out according to state law, was racially neutral and not susceptible to abuse. 779 P.2d at 566. Appellant has not demonstrated how the procedure used in his case was unfair or unreasonable. Accordingly, we find that Appellant was not denied a fair trial as the jury selection process in effect at the time of his trial met the fair cross section requirement of the Sixth Amendment.

█ In his third assignment of error, Appellant argues the trial court erred in denying his request to poll the jury panel for each person's age and race in order to collect evidence to support his motion to quash the panel. The introduction or refusal of evidence is a matter for the exercise of discretion by the trial court, whose decision will not be disturbed except for an abuse of discretion. *Haury v. State*, 533 P.2d 991, 995 (Okl.Cr.1975). We find no abuse of discretion in the present case.

Appellant was permitted to present documentary evidence and testimony to support his motion to quash. A polling of the 292 people who showed up for the jury panel on June 23, 1986, would only show the representation on that particular day. Further, a polling would not have advanced Appellant's position in meeting the test described in *Moore v. State*, 736 P.2d at 165. For the reasons set forth above, this proposition of error is denied.

█ In his fourth assignment of error, Appellant contends the court committed reversible error by denying his request to poll the veniremen selected for his jury to determine whether anyone had seen Appellant in handcuffs before he was brought to the courtroom. Appellant alleges several persons on the jury panel saw him in handcuffs in the doorway of the jail elevator, thus

violating 22 O.S.1981, § 15, which requires in part that no defendant be tried before a jury in chain or shackles.

We have previously held that Section 15 is not violated when the defendant is viewed by jurors for a brief moment while handcuffed or shackled outside the courtroom. *Childers v. State,* 764 P.2d 900, 903 (Okl.Cr.1988); *Wimberly v. State,* 698 P.2d 27, 32 (Okl.Cr. 1985). *See also Sherburn v. State,* 787 P.2d 1282, 1285 (Okl.Cr.1990). In the present case, Appellant appeared for a brief moment in handcuffs in the doorway of the jail elevator. The persons whom Appellant identified as witnesses to the incident were not seated on the panel to be sworn in as the jury. Also, a deputy told the court in a sidebar discussion that none of the veniremen to be impaneled as jurors were at the elevator when Appellant's handcuffs were removed. Appellant has failed to offer proof that the other veniremen in court witnessed the event or that the event was an intentional act which prejudiced his case. Therefore, this assignment of error is denied.

■ Appellant contends in his twentieth assignment of error that he was denied the opportunity to voir dire a juror who was excused for cause after expressing reservations against the death penalty. Specifically he refers to the following exchange:

THE COURT: Now, I'm going to ask you a question here, and I want each one of you to respond to it. This question—now listen—if you find beyond a reasonable doubt that the Defendant is guilty of Murder in the First degree, can you consider both legal punishments, life or death?

THE COURT: Ms. Childers

JUROR CHILDERS: No.

THE COURT: Ms. Childres, listen to this question: If you found beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree and if, under the evidence, the facts and circumstances of the case, the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts and circumstances of the case, you would not consider inflicting the death penalty.

JUROR CHILDERS: Right.

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court determined that the death penalty could not be carried out if the jury that imposed it had been selected by excluding for cause venirepersons who expressed general objection to the death penalty or conscientious or religious scruples against its infliction. *See also Duvall v. State,* 825 P.2d 621 (Okl.Cr.1991). A venireperson is only required to be willing to consider all the penalties provided by law and not be irrevocably committed before the trial has begun. *Banks v. State,* 701 P.2d 418, 421–422 (Okl.Cr.1985). Further, the manner and extent of voir dire examination rests largely in the sound discretion of the trial judge. *Id.*

This Court has consistently followed the standard developed by the United States Supreme Court in *Witherspoon* and in *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), that a trial court exercises its discretion in excusing for cause those jurors in a capital case whose views concerning the death penalty would prevent, or substantially impair, the performance of their duties as jurors. See *Rojem v. State,* 753 P.2d 359 (Okl.Cr.1988). Clearly, from venireperson Childers' response, there can be no doubt that her view on capital punishment could have substantially impaired the performance of her duties as juror in accordance with the instruction and oath. *See Banks,* 701 P.2d at 423. Further, we do not have a proper record from which to review the trial court's decision to disallow further questioning as Appellant failed to make a record of the questions he intended to ask the excused venireperson. *See Thomas v. State,* 811 P.2d 1337, 1351 (Okl.Cr.1991). Accordingly, this assignment of error is denied.

## FIRST STAGE TRIAL ISSUES

■ Appellant challenges the admission into evidence of several photographs showing various body parts of the decedent as found by the police and non-official individuals. He contends that the probative value of State's Exhibits 53, 54, 56, and 57, color photographs

of the decedent's arm, leg and skull after having been exposed to the elements, did not outweigh their prejudicial effect. We have long held that the admission of pictures of a deceased are relevant to establish the corpus delicti, to illustrate the injuries sustained by the victim, to corroborate expert testimony, and to establish intent. *Thomas v. State,* 811 P.2d at 1345. The photos in the present case were properly admitted into evidence as they were relevant in establishing the above factors.

■ In Appellant's sixth allegation, he claims the trial court erred in admitting evidence of luminol testing. Specifically, he claims that the test was conducted improperly and that it has not gained acceptance within the scientific community. In order for scientific evidence to be admissible, there must be evidence that the scientific tests used to gather such evidence are reliable and have been accepted and recognized by the scientific community. *Smith v. State,* 656 P.2d 277, 281 (Okl.Cr.1982). Moreover, tests used to gain scientific evidence are required to be accepted and recognized in the scientific community in order to assure accuracy and reliability of test results. *Plunkett v. State,* 719 P.2d 834, 840 (Okl.Cr.1986).

■ In the present case, Sergeant Bevel was offered as an expert in blood stain interpretation. He has previously been recognized as such by this Court. *See Farris v. State,* 670 P.2d 995 (Okl.Cr.1983). Blood detection utilizing the luminol test procedure was not the application of a new scientific technique. *See, Michael v. State,* 437 So.2d 138, 140 (Fla.1983); *People v. Garries,* 645 P.2d 1306, 1308 (Colo.1982). Further, there was no evidence showing that the proportions used in the mixture made up by the forensic chemist, Joyce Gilcrest, had any effect on the results obtained. The luminol test was employed merely as a presumptive test to determine if further testing should be done, much in the same manner as powder is utilized to cause latent fingerprints to become visible for taking and analyzing. In this case, once the location of the blood was made visible through the use of the luminol process, samples were secured for conclusive testing to be completed. We find the evidence obtained

from the luminol process, identifying the stains on the carpet as blood, was properly admitted.

■ In Appellant's seventh claim, he alleges that the trial court erred in failing to declare a mistrial when prosecution witness JoAnn Robinson remarked that Appellant had formerly been in prison. The record shows that in testifying to a conversation with Appellant, Ms. Robinson stated, "He was feeling bad, because things just didn't work out for him since he had come out of prison, not being able to get a steady job." Ms. Robinson had repeatedly been warned by the prosecution that she was not to mention the fact that Appellant had been in prison. The State indicated that it felt Ms. Robinson was a hostile witness. The jury was not informed of the crime for which Appellant had been incarcerated. Reviewing the situation closely, the trial court found that the statement was inadvertent and did not fit the criteria of an evidentiary harpoon. The judge then admonished the jury to "ignore, forget and strike from their minds, if they heard the last answer of witness, JoAnn Robinson". (Tr.877)

This Court has repeatedly held that evidence of another crime will not be excluded where it incidentally emerges as the events are revealed in their natural sequence. *Gay v. State,* 739 P.2d 531 (Okl.Cr.1987); *Bryson v. State,* 711 P.2d 932 (Okl.Cr.1985) cert. denied, 476 U.S. 1121, 106 S.Ct. 1986, 90 L.Ed.2d 668 (1986). Although Ms. Robinson was attempting to describe Appellant's mood when this information incidentally emerged, we find this particular portion of her testimony to be analogous to the evidence of another crime that emerged in *Gay.* Further, the admonishment and instruction during voir dire and at the end of the case cured any potential error. *See Goulsby v. State,* 742 P.2d 567, 571 (Okl.Cr.1987). Accordingly, the trial court correctly denied the motion for mistrial.

■ In the eleventh assignment of error, Appellant contends the evidence was insufficient to support a conviction for first degree murder. Appellant specifically challenges the evidence supporting the element of mal-

ice. The proof presented at trial consisted of both direct and circumstantial evidence, therefore we will review the sufficiency of the evidence under the standard set forth in *Spuehler v. State,* 709 P.2d 202 (Okl.Cr.1985); whether after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the essential elements of the crime beyond a reasonable doubt.

The evidence presented by the State in the instant case showed the decedent and Appellant shared an apartment, number 204, in Oklahoma City, from August until approximately September 22, 1985. Living in the apartment directly below them were Barbara and Bobby Jones. It was on the morning of September 22, 1985, that Barbara Jones saw the decedent for the last time. At approximately 10:00 a.m., the decedent took the trash to the dumpster. Later that evening, the Jones' left their apartment, returning between approximately 9:00 and 10:00 p.m. Each testified that around 10:00 p.m. they heard a loud noise coming from upstairs which sounded like someone jumping off furniture onto the floor. The noise was so loud that the Jones' apartment shook. The noise continued for several hours, stopping at approximately 1:00 a.m. Initially, the noise was heard at intervals of several minutes apart, and then at less frequent intervals. Barbara Jones testified that she could distinguish between the heavy footsteps of Appellant and the "softer" ones of the decedent. After that night, she never heard the decedent's footsteps again. She also stated that a week prior to this incident, she had heard the decedent and Appellant arguing. The decedent was overheard to say "don't hit me anymore".

On Monday, September 23, 1985, Barbara Jones heard a noise outside her door, near a storage closet at the end of the hall. Several minutes later she saw Appellant, wearing a pair of light blue pants or jeans, go up the stairwell to his apartment. He was seen leaving the apartment at approximately 10:00 a.m. that day in a blue Ford car which was usually driven by the decedent. The next day, Bobby Jones saw Appellant coming out of his apartment at 12:25 p.m. carrying two small dark colored trash bags, one in each hand. Appellant later apologized to Mr. Jones for being noisy. He told Jones that he did drink and had a tendency to get a little loud. However, Appellant did not indicate that he was apologizing for any specific time when he thought he may have been noisy.

The next time the Jones' saw Appellant was on September 28, 1985. At that time he was placing a red and white carpet cleaning machine in the back of a white pickup. Earlier that day, Ms. Jones had heard the noise of a carpet cleaner or vacuum upstairs for approximately two hours. Sometime around September 28, 1985, the decedent's mother, Carmen McKinney, came to the Jones' apartment asking if they had seen the decedent. The decedent and her mother usually talked to each other by telephone at least two or three times a week. However, Mrs. McKinney had not heard from her daughter since September 10, 1985. On September 25, 1985, Mrs. McKinney posted a note on the decedent's door asking her to call.

A.D. Smedley owned the apartment complex where the decedent and Appellant lived. He entered their apartment on the last day of September or the first of October, 1985, with Allen Savill and Roy Aber. While in the apartment, he noticed dark spots, which appeared to be blood, on the wall of the walk-in closet and a dark stain on the carpeting. Mr. Smedley placed a trespass note on the apartment door and had the lock changed on October 9, 1985. Shortly thereafter, Appellant contacted one of Smedley's employees and he authorized Appellant's entrance into the apartment to retrieve his clothing. Upon Smedley's visit to the apartment on October 11, 1985, he noticed that the stains on the wall were wiped clean and the carpet was damp.

On October 15, 1985, Smedley went back to the apartment with the police and as he stepped into the apartment they were met with a foul odor, like spoiled meat. At that time the officers removed some carpeting and part of the carpet pad. Smedley returned to the apartment on October 24, 1985, with Mr. Aber, and discovered more spots when they pulled the carpet back in the bedroom. The police were contacted and

upon their arrival at the apartment, they removed the entire bedroom carpet. The police also removed several pieces from the carpet pad. That same day, Smedley observed what appeared to be a spot of blood on a dining room drape and washed it off. On October 25, 1985, Smedley assisted in cleaning up the apartment and attempted to wash the stain off the floor where the carpet and pad had been removed. As he cleaned the stain with Clorox, the stain turned red.

Carpet layer John Fox removed the carpet from the apartment on October 25, 1985. He also observed the stains in the hallway and the odor in the apartment which was so nauseating that he took off his t-shirt, wrapped it around his face, and went outside and vomited. When Roy Aber let the Appellant into the apartment on October 11 to get his possessions, he noticed an odor. Appellant told him that the odor was caused by some hamburger meat which had spoiled. Aber did not detect an odor within the apartment the first time he visited the apartment with Savill, but he did notice one on his September 28 and October 2, 1985, visits.

Allen Savill, a maintenance engineer for Mr. Smedley, first went to apartment 204 during the week of September 23, 1985, when he noticed a brownish-red stain in the entrance to the bedroom closet. However, when he returned to the apartment the following Saturday, September 28, the stain had been cleaned up. He also noticed three apparently dirty towels hanging on a rack in the bathroom. All three towels had a reddish tint as if they had been used to clean up something. Savill also saw Appellant carry two loads of boxes to the trash dumpster on October 11, 1985. After Appellant left, Savill checked the dumpster and retrieved the three towels, which he had previously seen in the apartment bathroom, and put them in his truck. He later turned them over to Smedley, who turned them over to the police.

John Farris, Collection Agent for Ford Motor Credit Company, was sent to the decedent's apartment on September 25, 1985, to collect back payments due on decedent's 1982 Ford Fairmont and to repossess the vehicle if payment was not made. Just as he arrived at the apartment complex, Farris and his partner met Appellant coming out of the door to the stairwell of the apartment. Farris asked for directions to either apartment 36 or 205 and if he knew where Nancy McKinney lived. Appellant's response was that he did not know where either of those apartments was and gave Farris directions to the manager's office. As Farris and his partner were leaving, they saw Appellant get into the Ford Fairmont. Again, they asked him if he knew Nancy McKinney and he replied in the affirmative, but claimed that he did not know who they were talking about the first time.

On September 24, 1985, at approximately midnight, Appellant phoned JoAnn Robinson at her home in Tuttle and asked her to meet him in Oklahoma City. On September 26, Appellant and Robinson went to a pawn shop to redeem some tapes. Appellant asked Robinson to sign for the tapes because there had been a lady with him when he pawned them. Robinson signed the decedent's name to redeem the tapes. On September 27, Robinson and Appellant went to Otasco's and rented a Rug Doctor carpet cleaner.

Patricia Avery first met Appellant at Marie's Club in late September, either the 21st or 28th. Appellant moved in with her the following Monday and lived with her for approximately two (2) weeks. Avery testified that Appellant took her to the apartment where he and the decedent had lived. Appellant had her sit in the pickup while he went upstairs to the apartment, where he remained for ten or fifteen minutes. Avery then accompanied Appellant to the apartment to help him carry down his stereo. Appellant advised her there would be a bad odor because he had left some meat out. As she entered the apartment, Avery detected a very bad, gagging odor but saw no food or garbage laid out.

Lisa Austin first met Appellant on October 18, 1985. She lived with Appellant until the time of his arrest. Approximately one month after first meeting, Appellant told Austin that he had killed the decedent and cut her up.

Sixteen-year-old, Charles Dewayne Stokes, Jr., was playing on a pipe across the Deep

Fork River near Wellston, Oklahoma during the morning of December 28, 1985, when he noticed a dog chewing on a object that, upon closer observation, appeared to be a leg. David Habben lived on a ranch in South Logan County, near Waterloo Road and Indian Meridian. Located west of Mr. Habben's house is Coon Creek, which runs into the Deep Fork River. On February 3, 1986, he found an object that appeared to be a human skull in the front yard of his house. The skull had been laying there for approximately a month. Assisting in the search for his sister's body, the decedent's brother discovered an arm and attached hand in the middle of the Coon Creek stream bed. This creek bed was approximately a quarter of a mile west and two to three hundred yards south of Mr. Habben's house.

Eric Mullenix, homicide detective for the Oklahoma City Police Department, talked with Appellant on November 14, 1985. After reading Appellant his rights, Mullenix and Detective Horn talked to him from noon until approximately 7:30 p.m. Appellant told them that he and the decedent had lived together since July 1985. In August they moved to the apartment which the decedent had rented. However, she left it sometime around the first of September, taking all of her belongings, while he was visiting his parents in Red Rock, Oklahoma. He told the officers that he and the decedent had verbal arguments but that he had never struck her. He stated that he had not injured himself in the apartment nor was he aware of anyone else injuring themselves in the apartment to the extent that they would have bled heavily. He said he did clean the carpet before vacating the apartment, although admitting he had no cleaning deposit to be returned on the apartment. He explained that he had spilled red Kool-aid in the bedroom, having taken a glass to bed several times and having it knocked over. He also explained that he had spilled some oil in the living room hall after lubricating hinges on a door. When confronted with Mullenix' opinion that the authorities had reason to believe that Appellant caused the death of the decedent, he denied the killing and stated that the decedent had merely left and he had not seen her.

At approximately 3:00 or 4:00 p.m., Appellant hung his head, began crying, and asked to speak with his father, Willis Robedeaux. At that point, the officers attempted to contact Appellant's father by telephone. As the officers tried to locate Mr. Robedeaux, further questioning of Appellant ceased. The exception was an inquiry as to the location of the decedent's body.

Rod Tavanello of the Noble County Sheriff's Department and Bill Grant, an investigator with the Bureau of Indian Affairs, came to Oklahoma City to interview the Appellant on November 15, 1992. After being advised of his rights, the Appellant said that he had not seen the decedent since the first week of September. He stated that he and the decedent had "two or three fights" during the time they were living together, and he had hit her several times during these arguments. Appellant said that he was mad at the decedent because she had written several bad checks. He further stated they had gotten into a fight several days before she left and he had done a "number on her" when he hit her in the temple and in the face, causing her to bleed. He stated a ring he was wearing struck her in the head and that she was hit so hard her bleeding soaked the carpet. When asked about the blood in the closet, he responded by saying that he and the decedent had wrestled in the bedroom and that the decedent was "a big girl" who "fought back by hitting him in the mouth and splitting his lip". He then took her to the bathroom to clean her up and had to lean her up against the wall for support. He further stated that prior to that fight, they both had been drinking.

An examination of the skull and comparison to X-rays of the decedent was performed by Dr. Larry Balding, Medical Examiner's office, and anthropologist, Dr. Clyde Snow. The conclusion reached was that the skull was that of the decedent. They also examined the leg found at Deep Fork River. They were of the opinion that the leg was that of the decedent. Examining the arm and attached hand found at Coon Creek, the doctors opined that it too belonged to the decedent. Dr. Balding testified that there was no way, from the three body parts, to

determine the cause of death, but because of the evidence of dismemberment of the body, he believed it to be a homicide.

Tests performed on the towels retrieved from apartment 204 and the closet wall showed the presence of human blood, Type A, consistent with that of the decedent. Jeans belonging to Appellant showed the presence of human blood, Type A. Appellant had Type O blood. A luminol process performed on the carpet in the apartment revealed a high concentration of blood in specific areas of the carpet. It appeared as though the blood had been diluted and spread over the carpet through a cleaning process. The blood was typed and found to be Type A.

■ This Court has held repeatedly that the jury is the exclusive judge of the weight of the evidence and the credibility of the witnesses testimony. *Hollan v. State,* 676 P.2d 861, 864 (Okl.Cr.1984); *Isom v. State,* 646 P.2d 1288, 1292 (Okl.Cr.1982). Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal. *Enoch v. State,* 495 P.2d 411, 412 (Okl.Cr.1972). A reviewing court must accept all reasons, inferences and credibility choices that tend to support the verdict. *See Washington v. State,* 729 P.2d 509, 510 (Okl.Cr.1986).

Here the jury found sufficient evidence of guilt despite Appellant's thorough cross-examination of the State's witnesses wherein he pointed out certain inconsistencies in the State's evidence. Our review of the record shows that the jury's finding of the elements of the offense was supported by competent evidence. Specifically, we find that from all the facts and circumstances surrounding the killing, the jury could reasonably infer that Appellant had premeditated the killing. *See Williams v. State,* 668 P.2d 332, 335 (Okl.Cr. 1983). Therefore, we refuse to interfere with the jury's verdicts of guilt and this assignment of error is denied.

■ In proposition twelve, Appellant alleges that it was error for the trial court to admit into evidence tests, opinions, and exhibits of expert witnesses which had not been provided to the defense as requested in a valid discovery order. To establish a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant must establish that the prosecution suppressed evidence that was favorable to him or exculpatory and that the evidence was material. *United States v. Conner,* 752 F.2d 504, 506 (10th Cir.1985); *Gates v. State,* 754 P.2d 882, 886 (Okl.Cr.1988); *Hall v. State,* 650 P.2d 893, 897 (Okl.Cr.1982). A finding of materiality is required under *Brady. Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Irvin v. State,* 617 P.2d 588, 594 (Okl.Cr.1980). Materiality turns on the specific circumstances surrounding the alleged *Brady* violation. In *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985), the Supreme Court established a single test for materiality in those cases where the defense makes a specific request, a general request or no request for *Brady* material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

■ To find reversible error, the appellant must meet the burden of showing 1) the prosecution has actually suppressed evidence after that evidence has been requested by the defense; 2) the evidence was favorable to appellant's defense; and 3) the evidence is material either to the guilt of appellant or to his punishment. *Lay v. State,* 752 P.2d 823, 826 (Okl.Cr.1988), citing to *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

■ Specifically, Appellant complains about testimony concerning tests performed upon a femur bone (not that of the deceased) taken from the medical examiner's office from which Dr. Balding speculated that certain markings discovered on the decedent's femur bone were created by a saw or a knife. The record shows a lengthy discussion as to the admissibility of Balding's testimony which concluded in an agreement by the State to limit the testimony to an opinion

that the markings on the decedent's leg were created by a sharp instrument. Defense counsel indicated that they had been aware of that all along and agreed to the limited testimony. Any possible discovery problems were alleviated by this agreement between counsel.

■ We also reject Appellant's second alleged violation of the discovery order by the admission of testimony from Drs. Snow and Balding as to the position the leg must have been in for it to receive such markings. The record reflects that no report had been prepared on this issue and that defense counsel had previously spoken to the witnesses. Therefore, no reasonable probability exists that the outcome of the trial would have been different if the testimony had been disclosed to the defense. Further, Appellant's complaint about the use of a femur bone and a human pelvis, taken from the medical examiner's office for demonstration purposes, is not properly preserved for appellate review. The record shows that defense counsel specifically stated that she was not objecting to the demonstration use of the bones. *See Fitchen v. State,* 738 P.2d 177, 180 (Okl.Cr. 1987).

■ Finally, Appellant alleges the discovery order was violated by the use of color slides showing the markings on the cartilage cap of the femur. Defense counsel indicated that she had seen photos and x-rays of the subject, but the record is conflicting as to whether she had previously seen the actual slides. While the prosecution should have itself turned over the slides to the defense, instead of depending on the expert witnesses to do so, any resulting error is harmless in light of counsel's previous viewing of the photos. *See Stout v. State,* 693 P.2d 617, 625 (Okl.Cr.1984).

■ In his next assignment of error, Appellant relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to argue that the trial court erred in refusing to provide funds for the return of a defense expert witness from Ecuador and alternatively, to grant the defense a continuance until the witness could return and testify. The record shows that a continuance was initially

granted to the State to permit its anthropological expert, Dr. Snow, to return from South America. Upon notification of its anthropological expert, Dr. Ubelaker, of the new trial date, Appellant was informed that the witness would be in Ecuador at the time. Subsequent defense motions for state funds to fly Dr. Ubelaker back for trial and/or for a continuance until his return were overruled.

Neither the United States Supreme Court nor this Court has expanded the requirements of a court appointed expert beyond the *Ake* holding. *Banks v. State,* 810 P.2d 1286, 1293 (Okl.Cr.1991). The record in the present case reflects that the trial court initially approved the use of state funds for the employ of Dr. Ubelaker. Additional funds would have been required to fly the doctor back from Ecuador. Appellant has failed to show that the court was under any obligation to expend the additional funds or that he was prejudiced by the court's ruling. Appellant had access to an anthropologist in the form of state's witness, Dr. Snow, and Appellant thoroughly cross-examined Snow at trial. Further, Appellant has neither offered an explanation for failing to acquire the services of an equally competent anthropologist who could testify at trial nor has he explained why Dr. Ubelaker was not deposed prior to his trip to Ecuador. See 22 O.S.1981, § 761 et seq.

In pre-trial arguments, the trial court indicated that any potential problems had been solved by the agreement of the parties to stipulate to a summary of Dr. Ubelaker's testimony. With no objections voiced by the defense, the court ruled the motions for funds and for a continuance moot. It was not until presentation of the defense case in chief that Appellant argued that he had not agreed to the stipulation and did not intend to withdraw the motions. Overruling again the defense motions, the court admitted into evidence a letter summarizing Dr. Ubelaker's findings. His findings, based upon examination of documents, photographs and radiographs submitted by Appellant, did not indicate any major discrepancies from the testimony of the state's witnesses.

The defense has the preliminary burden of showing that the services of a requested expert witness are necessary for an adequate

defense. *Woodard v. State*, 743 P.2d 662, 665 (Okl.Cr.1987). Substantial prejudice exists only where the defendant shows that there is a reasonable probability that, but for the denial of funds, the factfinder would have a reasonable doubt regarding guilt. *Id.* We cannot say that the court's ruling in the instant case created a reasonable probability that the outcome of the case would have been different.

 Further, we find no abuse of the trial court's discretion in the denial of the motion for a continuance. The record shows that trial would have had to have been delayed for approximately two months, based upon Dr. Ubelaker's expected return date. Therefore, Appellant has failed to show that he suffered any prejudice by Ubelaker's absence from trial, and we find no error resulted from the denial of the continuance. Accordingly, Appellant was not denied due process of law and this assignment of error is denied.

 In his fourteenth assignment of error, Appellant asserts that the trial court erred when it failed to give his requested instructions on lesser degrees of homicide and voluntary intoxication. This Court has repeatedly held that an instruction on a lesser included offense or a theory of defense need only be given when there is evidence in the record to support such an instruction. *See Foster v. State*, 714 P.2d 1031 (Okl.Cr. 1986); *Green v. State*, 611 P.2d 262, 266 (Okl.Cr.1980). It is within the trial court's discretion and responsibility to consider the evidence to determine if such instructions are warranted. *Liles v. State*, 702 P.2d 1025 (Okl.Cr.1985).

 Here, the evidence warranted only instructions on first degree malice aforethought murder and Appellant's defense of alibi. To instruct on any lesser included offenses to malice aforethought murder or more than one theory of defense would be inconsistent. While Appellant is entitled to an instruction on his theory of defense, he is not entitled to instructions on every possible theory of defense. *See Kinsey v. State*, 798 P.2d 630, 633 (Okl.Cr.1990). As the evidence in the present case showed that Appellant

either killed the decedent with malice aforethought or was not present at the time of her death, the trial court properly refused Appellant's requested instructions.

 Appellant next challenges jury instruction No. 14 and the trial court's omission of the sentence "An admission by one in custody and charged with an offense should be carefully scrutinized and received with great caution" from Appellant's proffered instruction on "Voluntary Custodial Admissions". With the exception of the omitted language, Instruction No. 14 is OUJI–CR 811 verbatim. While we do not agree with the trial court's explanation for omitting that sentence from the instruction, we find that a trial court is under no obligation to use exact words of a submitted instruction. *See U.S. v. Pack*, 773 F.2d 261 (10th Cir.1985). It is sufficient for the court to instruct the jury on the general principles of law of the case. *Walston v. State*, 597 P.2d 768 (Okl.Cr.1979). If the totality of the instructions fairly and accurately state the applicable law, they are sufficient. *Coulter v. State*, 721 P.2d 818 (Okl.Cr.1986).

In the present case, Instruction No. 14 thoroughly explained to the jury the law concerning voluntary custodial admissions. In addition to explaining to the jury their task in considering the admission, the instruction also informed the jury that should they find that there was any inducement held out to defendant or threats of violence offered him, and that while under such circumstances he made the statement, they should disregard the admission in arriving at their verdict. Accordingly, we do not find that Appellant was prejudiced by the instruction. *See Eldridge v. State*, 557 P.2d 913 (Okl.Cr. 1976).

 In the seventeenth assignment of error, Appellant contends that it was error for the trial court to allow the introduction of evidence that he had committed previous assaults upon the deceased. Appellant recognizes that the conduct, attitude and feeling of the accused and the deceased toward each other may be shown in a murder case to establish motive, malice or intent, even though such evidence constitutes evidence of

other crimes. *Villanueva v. State,* 695 P.2d 858 (Okl.Cr.) *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985). However, Appellant contends that, in this case, the prejudicial effect outweighed the probative value.

The fact that evidence may arouse prejudice does not in itself require its exclusion if the evidence is otherwise relevant. *Mayberry v. State,* 626 P.2d 1361, 1364 (Okl.Cr.1981). In the case at bar, the issue is whether prior incidents were relevant to a material issue in the case. The statutory definition of relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". *Pugh v. State,* 781 P.2d 843 (Okl.Cr. 1989), citing 12 O.S.1981, § 2401. Relevancy and materiality are matters within the sound discretion of the trial court absent an abuse thereof. *Behrens v. State,* 699 P.2d 156, 158 (Okl.Cr.1985). Here, the evidence that Appellant had committed previous acts of assault against the deceased was relevant to the issue of malice aforethought. See, *Villanueva,* 695 P.2d at 860. Accordingly, this allegation is denied.

Appellant further alleges that it was error to admit his statements given to Detective Mullenix and Officer Tavanello as they were not made voluntarily. Appellant argues that his request to Mullenix to speak with his father was the equivalent of a request for counsel.

In *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the United States Supreme Court held that the rigid rule of *Miranda* that a request for a lawyer is a per se invocation of the right to silence, is not applicable to request for a probation officer. The Court further stated that the rule of *Miranda* was based on the unique role lawyers play in the criminal justice system and "that a probation officer is not in the same posture with regard to the either the accused or the system of justice as a whole." The Appellant's father, not trained in the law, is similarly not in the same posture as an attorney. Therefore, the Appellant's request for his father is merely another factor to consider within the totality of the circumstances in determining whether the statement was admissible.

The record shows that Appellant was read his *Miranda* rights by Detective Mullenix. He stated that he understood his rights and wished to talk with the police. He did not request an attorney but at one point did ask for his father. The examination of Appellant ceased with the exception of one inquiry as to the location of the decedent's body. After asking for his father, Appellant refused to answer any questions from the police. We find that Appellant's statement was not an invocation of his right to counsel, that it was made voluntarily and was therefore properly admissible.

Appellant gave a second statement to Rod Tavanello, Deputy Sheriff for Noble County. Appellant was again advised of his rights, stated that he understood and agreed to talk with the officer. Appellant did not request an attorney nor did he refuse to talk with the officers. The day before, Appellant had stated that he did not want to talk further until he had spoken with his father. Here again, Appellant knowingly waived his right to remain silent, failed to effectively reassert it a day later, and voluntarily spoke with the officers.

Appellant further asserts that the trial court erred in permitting testimony on Appellant's post-arrest silence. In *Rowe v. State,* 738 P.2d 166 (Okl.Cr.1987), the defendant specifically waived his right to remain silent and agreed to cooperate in the investigation. He answered several questions and then suddenly stopped talking. This Court upheld the admission of testimony regarding this "sudden stoppage" as elicited by the prosecution in examining the investigative officer. Similarly, in the present case, the trial court properly allowed the State to elicit testimony concerning Appellant's sudden failures to respond.

Appellant alleges next that prosecutorial misconduct occurred during the first stage closing argument. Specifically, he objects to the following comments:

As far as the circumstantial evidence, read that instruction. All you've got to do is just read it, because it talks about the evidence having to be inconsistent with any reasonable theory of his innocence.

Ladies and gentlemen, Mr. Toure talked about it, Ms. Foley talked about it. Neither one of them offered you any reasonable theory of innocence.

MS. FOLEY: Objection, your Honor. We don't have to prove any reasonable theory.

THE COURT: Talking about your argument. Overruled. (Tr. 1563–1564)

Appellant argues that not only did these comments shift the burden of proof, but they constituted impermissible comments upon Appellant's right to remain silent. We disagree.

█ Before such comments can be considered error, they must "directly and unequivocally call attention to the Defendant's failure to testify". *See Hays v. State,* 617 P.2d 223, 230 (Okl.Cr.1980). The comments must be such that they jury would naturally and necessarily understand that the statements could only be rebutted by the defendant personally. *Id.* After carefully reviewing the comments in question, we are unable to find that these remarks directly called attention to Appellant's failure to testify or that they impermissibly shifted the burden of proof. When read in context, it is clear that the comments were references to remarks made during the closing argument of defense counsel. The comments were reasonable inferences well within the boundaries of permissible closing argument. *See Carol v. State,* 756 P.2d 614, 617 (Okl.Cr.1988).

### SENTENCING STAGE

█ Citing to *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987), Appellant contends in his eighth allegation of error that Oklahoma has been allowing the "especially heinous, atrocious or cruel" aggravating circumstance to be applied in an arbitrary manner. This issue was addressed in *Romano v. State,* 847 P.2d 368, 386 (Okl.Cr.1993), wherein we noted that the problems underlying the reversal of Cartwright's death sentence stemmed from the fact that the jury was given incomplete instructions. The instructions did not address the limiting factors previously adopted and mandated by this Court for use with the aggravating circumstance "especially heinous, atrocious or cruel".

The jury instruction given in the present case, both paragraphs of Oklahoma Uniform Jury Instructions—Criminal No. 436, embodied the limitations which the sentencer must consider in the application and finding of this particular aggravating circumstance. Accordingly, we find that this particular aggravating circumstance was applied in a constitutional manner.

█ Appellant further argues that the concept of appellate review, which includes reweighing of aggravating and mitigating factors as set forth in *Stouffer v. State,* 742 P.2d 562 (Okl.Cr.1987) (Opinion on Rehearing), is improper. He contends that this Court's practice of reweighing aggravating circumstances versus mitigating evidence usurps the jury's function. In *Castro v. State,* 749 P.2d 1146, 1148 (Okl.Cr.1987), we determined that the potential reevaluation of the defendant's sentence during direct appeal proceedings does not encroach upon his right to jury sentencing and permits this Court to affirm the death sentence even if one aggravating circumstance fails. Although the capital sentencing statutory scheme does provide for jury sentencing, it also provides for sentence review by the Court and for review by the state district court and this Court through post-conviction procedures. 21 O.S.Supp.1985, § 701.13; 22 O.S.1981, § 1080 *et seq. See also Romano,* 847 P.2d at 389–390. Accordingly, this assignment of error is denied.

In his ninth contention, Appellant argues that Oklahoma's first degree murder statute is unconstitutional in both its actual operation and in its operation as perceived by the general public. This Court has consistently upheld the constitutionality of the statutes which allow the imposition of the death penalty. *Hale v. State,* 750 P.2d 130 (Okl.Cr. 1988); *Banks v. State,* 701 P.2d at 421; *Jones v. State,* 660 P.2d 634 (Okl.Cr.1983). The constitutionality of capital punishment

has been upheld by the U.S. Supreme Court. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Moreover, our statutes comply with the mandates of *Gregg* and *Proffitt* and are not violative of the Eighth and Fourteenth Amendments. *Boutwell v. State,* 659 P.2d 322 (Okl.Cr.1983); *Hays v. State,* 617 P.2d 223 (Okl.Cr.1980); *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980).

In regards to the public's perception of the death penalty, Appellant refers this Court to numerous selected newspaper articles on the general perception of life imprisonment as actually less than imprisonment for the remainder of one's life. As in *Moore v. State,* 788 P.2d 387, 402 (Okl.Cr.1990), we reject this argument, finding that Appellant failed to demonstrate at trial, or now on appeal, that the jurors selected to serve in his case held this belief.

 In his tenth proposition, Appellant raises two allegations: (1) error in instructing the jurors not to allow sympathy or sentiment to enter into their decision; and (2) the failure to instruct the jury that they could consider mercy and the individual circumstances of the Appellant. Specifically, he complains of instruction No. 21 given in the first stage and instruction No. 12 given in the second stage.

In *Fox v. State,* 779 P.2d at 574, this Court affirmed the use of the "anti-sympathy" instruction, stating that what was prohibited by the instruction, and what would be understood by a reasonable juror as being prohibited, were "emotional responses not rooted in the aggravating and mitigating evidence introduced during the penalty ·phase." The United States Supreme Court also upheld the use of the instruction in *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). The instructions given in the instant ·case were identical to the ones given in *Fox* and *Parks.* Therefore, we find it was not error to give the anti-sympathy instruction. *See also Williamson v. State,* 812 P.2d 384, 408 (Okl.Cr.1991); *Moore v. State,* 788 P.2d at 401.

Further, as to an instruction on the consideration of mercy and the individual circumstances of the Appellant, the jury was given a list of sixteen (16) mitigating factors and instructed that they could consider those sixteen and any other mitigating circumstances they found from the evidence presented. These instructions enabled the jury to make a reasoned decision on the appropriateness of the death sentence based upon the unique and individual circumstances of this case and of the Appellant.

 In his sixteenth assignment of error, Appellant contends that the introduction of evidence of unadjudicated crimes in the second stage was error. Specifically, he asks this Court to reconsider its holding in *Johnson v. State,* 665 P.2d 815 (Okl.Cr.1983), that such evidence is admissible in the sentencing stage of a capital case. We are not persuaded by Appellant's contention that this holding is at odds with the constitutional requirements of reliability in sentencing and equal protection. Such evidence has been found relevant to the jury's determination as to whether a person is likely to commit future acts of violence that would constitute a continuing threat to society. *See Williamson v. State,* 812 P.2d at 405; *Boltz v. State,* 806 P.2d 1117 (Okl.Cr.1991). For the foregoing reasons, we find that this assignment of error is denied.

 In his twenty-first assignment of error, Appellant combines two allegations: (1) that the trial court failed to dismiss duplicitous aggravating circumstances and (2) that error occurred when the trial court permitted the jury to consider identical evidence to prove different aggravating circumstances. In particular, Appellant contends that the "continuing threat to society" and the "prior violent felony conviction" aggravators were duplicitous because they allowed the prosecution to use the same facts twice to double the number of aggravating circumstances.

 Use of the same evidence in different manners to support two aggravating circumstances does not necessarily make the two into one aggravating circumstance. *Berget v. State,* 824 P.2d 364, 376 (Okl.Cr.1991). In *Green v. State,* 713 P.2d 1032 (Okl.Cr. 1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 241, 36 L.Ed.2d 165 (1986), we adopted the

reasoning of the Supreme Court of Florida in *Delap v. State,* 440 So.2d 1242 (Fla.1983), and found that aggravating circumstances are only duplicative when they cover the same aspect of the defendant's criminal history. *See also Pickens v. State,* 850 P.2d 328 (Okl. Cr.1993).

In the present case, the jury was not called upon to consider the same act or an indivisible course of conduct to constitute more than one aggravating circumstance. Evidence of Appellant's violent behavior to prove "continuing threat" was presented through the testimony of the decedent's children, Appellant's wife and past girlfriend. The aggravating circumstances of "prior violent felony conviction" was proven by a certified judgment and sentence for the commission of second degree murder.

█ Appellant asserts next that the instructions given in the second stage of trial failed to properly define mitigating circumstances. Appellant claims that these instructions failed to tell the jury the full extent of what it might consider in determining Appellant's sentence. The trial court instructed the jury regarding mitigating evidence as follows:

> Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the fact and circumstances of this case.

(O.R. 482)

This instruction, No. 8, is OUJI–CR 438 verbatim. Instruction No. 9 sets forth a list of sixteen (16) possible mitigating circumstances and added that the jury could consider any additional mitigating circumstances that they might find from the evidence in this case. We find that the jury was appropriately instructed as to mitigating evidence.

█ In his next assignment of error, Appellant claims that the trial court erred in failing to instruct the jury that it could return a sentence of life even though it may find that the aggravating circumstances outweigh the mitigating circumstances. Although a trial judge may, in the exercise of his sound discretion, give such an instruction,

it is not error for him to refuse the request. *Walker v. State,* 723 P.2d 273, 284 (Okl.Cr. 1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600. In fact, the courts have almost uniformly held that a criminal defendant is not entitled to such an instruction. *Id. See also Pickens v. State,* 850 P.2d at 339. *Williamson v. State,* 812 P.2d at 410. We find no error in the omission of this instruction in the instant case.

## MANDATORY SENTENCING REVIEW

Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1981, § 701.-12.

█ The jury found the existence of three (3) aggravating circumstances; 1) that the murder was especially heinous, atrocious, or cruel; 2) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and 3) that the defendant had been previously convicted of felonies involving the use or threat of violence to the person. In our review, we have found the evidence insufficient to support the "especially heinous, atrocious or cruel" aggravator. The record is void of any evidence showing that the murder was preceded by torture or serious physical abuse. The medical examiner testified that there was no evidence of antemortem injuries to the skull or the other body parts found. Only the Appellant could describe the manner in which he killed the decedent and his statements shed no light on the subject. While the dismemberment of the decedent's body is certainly cruel, there is no evidence that this occurred prior to the decedent's death.

█ Turning to the remaining aggravating circumstances, we find they were supported by sufficient evidence. In evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society, we have held that the murder for which the appellant was convicted, and evidence of the callousness of his actions, can be considered

as supporting evidence. *Fox v. State,* 779 P.2d at 577; *Fowler v. State,* 779 P.2d 580, 589 (Okl.Cr.1989); *Robison v. State,* 677 P.2d 1080, 1088 (Okl.Cr.), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). This aggravating circumstance may also be proved by evidence of unadjudicated criminal acts. *Johnson v. State,* 731 P.2d 993 (Okl.Cr. 1987).

 Here, the State presented evidence that Appellant verbally and physically threatened the children of the decedent, including choking one of her daughters and using his fist to strike her son in the face and force him up against a wall. The decedent's son also testified to seeing a gun, a machete and a baseball bat underneath Appellant's mattress. Appellant's ex-wife testified to a beating and choking she received from him in 1985, causing her to be hospitalized for approximately two (2) days. Lisa Austen also testified to a fight with the Appellant wherein he attempted to run over her with his truck. Jumping out of the way, she proceeded up the stairs to her apartment. Appellant followed her, jumped on her back and proceeded to kick and choke her. She also testified to an occasion when Appellant threw her two (2) year old son on the floor, causing his nose to bleed. Patricia Avery testified that in November 1985 she refused Appellant's repeated requests for money. One evening as she was leaving her job at a local club, bound for the home of her boss with the evening's money, Appellant surprised her in the parking lot, jumping out from behind a car. He grabbed her by the throat and attempted to take the money bag. Avery was able to extricate herself from Appellant's grasp and escaped by jumping in her car. We find this evidence of Appellant's prior unadjudicated acts of violence, together with his killing of Nancy McKinney, to support the jury's finding of the continuing threat aggravating circumstance.

 The third aggravator found in the present case, that the defendant had been previously convicted of felonies involving the use or threat of violence to the person, was sufficiently supported by a 1978 judgment and sentence for second degree murder. Upon a finding that one aggravating circumstance is invalid, this Court has the authority to reweigh valid aggravating circumstances against the mitigating evidence. *Hayes v. State,* 845 P.2d 890 (Okl.Cr. 1992). *See also Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Appellant presented fifteen (15) witnesses during the second stage of trial who testified to the following: that Appellant had a family and friends that loved and cared for him and was concerned for his welfare; that he had a good relationship with his three (3) children, who would be without a natural parent if Appellant were sentenced to the death penalty; that Appellant was given up for adoption by his natural mother when an infant; that he had a drug and alcohol problem; that Appellant was usually employed throughout his life and was well-liked by his fellow employees; that at the time of the murder his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the law was impaired by the effects of drugs, alcohol, and diabetes; that he is a severe diabetic; that he is a talented musician and was a good prisoner when previously incarcerated; that while on escape status, he turned himself in; and that Appellant exhibited good behavior during the course of the trial and while in jail awaiting trial. This evidence was summarized into (16) factors and submitted to the jury for their consideration as mitigating evidence.

Upon our review of the record and careful weighing of the valid aggravating circumstances, any impact the invalid aggravator may have had, and considering all of the Appellant's second stage evidence as mitigating, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the judgment and sentence for First Degree Murder is **AFFIRMED.**

JOHNSON, V.P.J., and LANE, J., concur.

CHAPEL, J., specially concurs.

CHAPEL, Judge, specially concurring:

While I agree James Glenn Robedeaux's conviction and sentence should be affirmed, I believe the trial court erred in failing to

grant Robedeaux a continuance. The trial court granted the prosecution a continuance when the prosecution's expert witness was out of the country and unable to attend the trial. Although Robedeaux's expert was available to testify on the original trial date, his expert was out of the country on the new trial date. When Robedeaux requested a continuance, the trial court refused to grant Robedeaux the same relief which it had extended to the State. Given that the trial court had granted the prosecution a continuance when its expert was out of the country, it seems manifestly unfair for the trial court to deny Robedeaux a continuance when precisely the same circumstances existed. *See e.g. United States v. West,* 828 F.2d 1468 (10th Cir.1987); *Teat v. State,* 181 Ga.App. 735, 353 S.E.2d 535 (1987). Nonetheless, I find that this error should not be grounds for relief because Robedeaux has failed to show how he would be prejudiced by the trial court's error. Nor do I find that the testimony of Robedeaux's expert would have affected the outcome of the trial. *Lovelady v. State,* 478 P.2d 983 (Okl.Cr.1970). For this reason, I concur in the judgment of the Court.